**In the Matter of MALLARD ASSOCIATES, a Limited Partnership, Debtor.**

**Bankruptcy No. 78 B 1901 JL.**

United States Bankruptcy Court, S. D. New York.

Jan. 21, 1981.

Norman Klasfeld, Gerald & Lawrence Blumberg, New York City, for debtor; Lawrence Blumberg and Gerald Blumberg, New York City, of counsel.

Trubin, Sillcocks, Edelman & Knapp, New York City, for the Greenwich Sav. Bank; Lola S. Lea and Steven L. Bock, New York City, of counsel.

## OPINION

JOEL LEWITTES, Bankruptcy Judge.

On October 25, 1978, Mallard Associates ("Mallard") filed a petition for an arrange-

ment under Chapter XII of the former Bankruptcy Act of 1898.[1] The commencement of that case signaled an immediate legal response from Mallard's sole secured creditor, the Greenwich Savings Bank ("Greenwich"), i. e., a motion to dismiss, which was the subject of several court decisions.[2] The mutual hostility between the delayed creditor, Greenwich, and the distressed debtor, Mallard, has not subsided, and occasions this decision in the twilight hours of the case—the confirmation of the Chapter XII arrangement.

## A

On January 11, 1979, Mallard filed its arrangement containing two alternative proposals, each modifying and altering the rights of Greenwich which held a mortgage on the debtor's subject premises, a commercial building located at 45 West 45th Street in New York City. On February 15, 1979, Greenwich, in accordance with the provisions of Bankruptcy Rule 12–37[3], formally rejected both alternatives of Mallard's plan.[4] Thereafter, in conformity with Bankruptcy Rule 12–36(b),[5] this Court fixed June 27, 1979 as the last day for the filing of a creditor's plan. Greenwich filed its "plan" on June 26, 1979 which provided for the payment in cash, on confirmation, by Mallard to Greenwich, of 100% of the latter's claim.[6] In addition, the Bank's plan required that Mallard pay to Greenwich legal fees, allegedly amounting to $56,-762.50, and purportedly borne by the Bank in connection with this Chapter XII case. Although Greenwich never accepted its own plan in writing,[7] Mallard, in accordance with Bankruptcy Rule 12–38(c),[8] filed objections to the creditor's plan. Mallard argues that Greenwich's plan or arrangement[9]

---

1. Former Bankruptcy Act § 401 et seq., 11 U.S.C. § 801 et seq., (now repealed). The former Act, of course, governs this case. See Bankruptcy Reform Act of 1978 § 403(a).

2. See Matter of Mallard Associates, 463 F.Supp. 1259 (S.D.N.Y.1978), on remand, Matter of Mallard Associates, 20 C.B.C. 1061 (S.D. N.Y.) (Bankruptcy Court), aff'd 475 F.Supp. 1045 (S.D.N.Y.1979).

3. 421 U.S. 1110, 95 S.Ct. 2753, 44 L.Ed.2d lxx.

4. The district court has previously held in this Chapter XII case that the former Bankruptcy Act, applicable here, permits confirmation of a Chapter XII arrangement over the objection of a single creditor. Matter of Mallard Associates, 475 F.Supp. 1045 (S.D.N.Y.1979). That determination is the law of this case. Wharton v. Hirsch, 348 F.2d 906, 907 (2d Cir. 1965) (Chapter X case).

5. 421 U.S. 1109, 95 S.Ct. 2752, 44 L.Ed.2d lxx.

6. On the date Mallard filed its Chapter XII petition, Greenwich was owed $1,269,959.06, of which $1,003,970.20 represented the principal balance of the mortgage, $143,116.93 was attributable to unpaid interest, while $122,871.93 reflected real estate taxes and other charges that had been paid by Greenwich. It should be noted, that during the course of this case, the unpaid principal amount of the mortgage was reduced to $993,307.45 when, on June 21, 1979, Mallard, by order of this Court dated June 18, 1979, paid over to the Bank a $10,662.85 insurance payment that Mallard had received from its insurer following a fire at the subject premises.

7. Bankruptcy Rule 12–37(b), 421 U.S. 1110, 95 S.Ct. 2753, 44 L.Ed.2d lxx, requires that "[a]n acceptance or rejection shall be in writing, shall identify the plan or plans accepted or rejected, and shall be signed by the creditor or his authorized agent." The purpose behind the requirement of a written acceptance is to provide a mechanism whereby, if more than one plan is submitted to creditors, the creditors can properly identify the plan to which their acceptance or rejection is addressed. See Advisory Committee's note to Bankruptcy Rule 12–37(b), 1979 Collier Pamphlet Edition, Part 2 at 702. In the instant case, Greenwich, Mallard's sole secured creditor, previously rejected Mallard's plan and, accordingly, on June 26, 1979, the only other plan on the table was the one submitted by Greenwich. Since we are told that we must concern ourselves only "with the substantive fact of acceptance, not the mechanics of registering the assent". Cf. In re Pressed Steel Car Co. of New Jersey, 16 F.Supp. 329, 337 (W.D.Pa.1936) (reorganization case under Bankruptcy Act § 77B, the predecessor to Chapter X of the Bankruptcy Act of 1898), under the circumstances present here, we must necessarily conclude that Greenwich accepted its own plan, albeit without the benefit of a written acceptance.

8. 421 U.S. 1112, 95 S.Ct. 2754, 44 L.Ed.2d lxxi.

9. The terms "arrangement" and "plan" are interchangeable in the context of a Chapter XII case. The Bankruptcy Act uses the term "arrangement"; the Bankruptcy Rules utilize the term "plan".

does not comply with the requirements of former Bankruptcy Act § 461(1) since that arrangement, *inter alia,*[10] does not purport to modify or alter Greenwich's debt.[11] Additionally, Mallard, pursuant to Bankruptcy Rule 756[12] moved for summary judgment to dismiss Greenwich's plan.

In November 1979, this Court appointed Bernard Reuben as an independent, disinterested court appraiser to appraise the subject premises. A hearing was held, thereafter, on February 6, 1980 for purposes of valuation of the premises. At that hearing, Mr. Reuben testified that a ten-year mortgage could be placed on the building for $1,109,000, or 70% of his $1,585,000 appraisal at a total annual payment of interest and amortization of 12.27%; Mr. George Transom, Greenwich's appraiser, stated that a ten-year mortgage on the premises could be obtained for $1,260,000 or 70% of his $1,800,000 appraisal with annual interest and amortization at the rate of 13.57%; Mr. Walter Rothschild, testifying on behalf of Mallard, stated that no mortgage could be

obtained for the premises but he nevertheless appraised the property at $975,000.

Several weeks subsequent to the valuation hearing, Mallard modified its plan, in accordance with Bankruptcy Rule 12–39,[13] by proposing a third alternative.

On February 12, 1980, a confirmation hearing was held to determine whether this Court should confirm Mallard's modified plan (its third alternative) or Greenwich's plan.[14] We now turn to an assessment of the two competing plans in the context of a Chapter XII case.

B

Discussion

(1)

*Greenwich's Plan*

Bankruptcy Rule 12–36(b),[15] which is derived from former Bankruptcy Act § 466,[16] permits a secured creditor to file a plan within the time fixed by the Court.[17] As stated earlier, Greenwich, in fact, timely

---

**10.** Mallard additionally attacks Greenwich's plan on the grounds that it provides for legal fees without application to this Court and because the plan is not feasible.

**11.** Bankruptcy Act § 461(1), now repealed, requires that an arrangement "shall include provisions modifying or altering the rights of [secured] creditors. . . ."

**12.** 411 U.S. 1084, 93 S.Ct. 3159, 37 L.Ed.2d lxxii. This rule provides that Fed.R.Civ.P. 56 applies in adversary proceedings. Although Mallard's underlying objection to confirmation clearly is not an adversary proceeding under Bankruptcy Rules 701 *et seq.,* 411 U.S. 1068 *et seq.,* but is rather a contested matter, Bankruptcy Rule 914, 411 U.S. 1098, 93 S.Ct. 3170, 37 L.Ed.2d lxxviii this latter rule clearly states that "[i]n all such [contested] matters, unless the Court otherwise directs", Bankruptcy Rule 756, *inter alia,* applies.

**13.** 421 U.S. 1113, 95 S.Ct. 2754, 44 L.Ed.2d lxxi. Since there had been no acceptance of Mallard's plan, comprising the first two alternatives, the debtor, by the terms of Rule 12–39, could modify its plan without leave of this Court.

**14.** Two months after the close of the confirmation hearing on each of the two plans, Greenwich, without leave of the Court, filed a modifi-

cation of its original plan, presumably in accordance with Bankruptcy Rule 12–39. Greenwich immediately accepted this "modified" plan in writing and Mallard forthwith retorted by filing objections thereto. In our view, Greenwich's modified plan is not properly before this Court. Bankruptcy Rule 12–39 permits modification of a plan, without leave of the Court, at any time prior to the acceptance of the original plan. Where a plan has been previously accepted by the requisite majority of creditors, however, as here (see note 7, *supra*), modification of a plan may be filed *only* with leave of this Court. Greenwich's filing of its modified plan without this Court's permission renders its modification a nullity and accordingly, we will not consider it as a candidate for confirmation. Because of this disposition of Greenwich's attempted modification of its plan, we do not address ourselves to Mallard's other objections thereto.

**15.** 421 U.S. 1109, 95 S.Ct. 2752, 44 L.Ed.2d lxx.

**16.** 11 U.S.C. § 866 (repealed).

**17.** Parenthetically, the Bankruptcy Reform Act of 1978, Section 1121(c), 11 U.S.C. § 1121(c) (1978) permits, under three stated conditions, the filing, *inter alia,* of a creditor's plan.

filed its plan and is deemed, for reasons set forth above,[18] to have accepted it.

Section 467 of the former Bankruptcy Act, in pertinent part provides that

"An arrangement which at the meeting of creditors ... has been accepted in writing [19] by all creditors affected thereby, whether or not their claims have been proved, shall be confirmed by the Court when there shall have been made the deposit required under this Chapter and under the arrangement, and if the Court is satisfied that the arrangement and its acceptances are in good faith and not have been procured by any means, promises, or acts forbidden by this Act." [20]

We have held, on a previous occasion, that Section 467 mandates, without regard to the unaccepted debtor's plan, the confirmation of a creditor's plan if the Bankruptcy Court is satisfied that the conditions set forth in that section are met.[21]

■ We have noted earlier, that the definition of an arrangement, *inter alia*, requires that it include "provisions modifying or altering the rights of creditors who hold debts secured by real property...." [22] Although we have interpreted this clause to permit any alteration or modification of a secured creditor's rights,[23] Greenwich's plan, on its face, fails to reveal even the slightest alteration or modification of its rights. Indeed, the Bank's plan would require Mallard to pay 100% of the latter's debt to it on confirmation. We have warned that "a sham plan and a subsequent

ritualistic acceptance thereof, will not pass muster under § 467." [24] In our judgment, Greenwich's plan is not an arrangement contemplated by the terms of former Bankruptcy Act §§ 406(1) and 461(1). Accordingly, since Greenwich has not satisfied the very first condition of § 467, that there be "[a]n arrangement....," its plan is not eligible to be confirmed.[25] To the extent that Mallard has moved for summary judgment to dismiss its creditor's plan, we discern no material issue of fact and find that Mallard, as a matter of law, is entitled to the relief it requests.

(2)

*Mallard's Plan as modified*

(a)

Mallard's modified plan provides, first, that on confirmation, it will reimburse Greenwich in the amount of $122,871.93, for all real estate taxes, interest and penalties represented by Greenwich to be due the latter. Additionally, on confirmation, Mallard will make a cash payment to Greenwich for all arrears in interest charges. The remainder of Mallard's debt of $993,-307.45 due to Greenwich shall be evidenced by a new non-recourse note to be executed by Greenwich upon confirmation. This note will provide for a maturity date of May 1, 1983 [26] and shall require constant monthly payments of 14% annually, to be applied first to interest at the rate of 13% annually and the balance to amortization.[27] In short, under this plan. Greenwich will

18. See note 7, *supra*.

19. *Ibid*.

20. 11 U.S.C. § 867 (repealed).

21. *In the Matter of Flushing Mall Company, and Flushing Holding Company* 5 Bankr.Ct. Dec. 524 (S.D.N.Y.1979) (Bankruptcy Court), aff'd 7 B.R. 277, (Bkrtcy.S.D.N.Y.1980) (Motley, D.J.).

22. See note 11, *supra*. See also former Bankruptcy Act § 406(1), 11 U.S.C. § 806(1) (repealed).

23. *Supra*, note 21 at 527.

24. *Supra*, note 21 at 528.

25. Mallard has raised several other less substantial objections to Greenwich's plan. Although we do not reach them, in view of our analysis above, we must remind Mallard that where confirmation is controlled by former Bankruptcy Act § 467, feasibility of the arrangement is not, *inter alia*, a condition precedent for confirmation. See *supra* note 21 at 530, n.22.

26. May 1, 1983 is the maturity date of the original note and mortgage executed by Mallard's predecessors in favor of Greenwich.

27. Under Greenwich's present mortgage the interest rate is 8½%.

receive full payment of its entire debt within the maturity date of Greenwich's present mortgage, but at a higher interest rate.

### (b)

### "Cram-down"

We must now consider whether Mallard, may, under the provisions of former Bankruptcy Act § 461(11),[28] unappetizingly "cram" its plan down Greenwich's apparently [29] unreceptive throat.

In order for this Court to permit a debtor to retain its interest in the subject premises, without paying its secured creditor therefor, in full, at confirmation, such creditor must be provided with the "indubitable equivalent",[30] of, or adequate protection for, the security sought to be retained by the debtor.[31]

Section 461(11) of the former Act provides that an arrangement

"shall provide for any class of creditors which is affected by and does not accept the arrangement by the two-thirds majority in amount required under this chapter, adequate protection for the realization by them of the value of their debts against the property dealt with by the arrangement and affected by such debts, either as provided in the arrangement or in the order confirming the arrangement, (a) by the transfer or sale, or by the retention by the debtor, of such property subject to such debts; or (b) by a sale of such property free of such debts, at not less than a fair upset price, and the transfer of such debts to the proceeds of such sale; or (c) by appraisal and payment in cash of the value of such debts; or (d) by such method as will, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection...." [31a]

Mallard's proposal seeks application of the fourth alternative method of cram-down, § 461(11)(d). This catch-all procedure, which has been observed to be not "a 'method' at all",[32] contemplates, *inter alia,* an extension of the payments beyond the terms of the original mortgage or a modification of such mortgage, provided, of course, that the creditor will receive, with interest, "the value of the property as fixed by the Court." [33]

We stated earlier that a valuation hearing was held by this Court to determine the value of the subject premises. There, it may be recalled, this Court heard estimates from three expert witnesses ranging from the debtor's appraisal of $975,000 to the creditor's valuation of $1,800,000. The Court's appraiser found a value closer to that of the creditor's, $1,585,000.

All three witnesses utilized the capitalization-of-income-approach which requires

"(1) an estimation of the reasonably prospective earnings and (2) the capitalization or discount of these earnings at a rate which will reflect the risks inherent in the debtor's continued ownership and operation." [34]

The projected evaluation is then reached by the mathematical results of the fraction constructed by a numerator representing the projected net income and a denominator expressing the capitalization rate.

---

28. 11 U.S.C. § 861(11) (repealed).

29. Greenwich never formally accepted or rejected Mallard's modification of the plan.

30. *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir. 1936). The alluring phrase, "indubitable equivalent", penned by Judge Learned Hand, so captured the fancy of Congress, that it was used by it in the Bankruptcy Reform Act of 1978 as one of the available modes for "adequate protection." See 11 U.S.C. § 361(3) (1978).

31. *Matter of Mallard Associates*, 475 F.Supp. 1045, 1053 (S.D.N.Y.1979).

31a. 11 U.S.C. § 861 (repealed).

32. *Kyser v. MacAdam*, 117 F.2d 232, 238 (2d Cir. 1941).

33. *Matter of KRO Associates*, 17 C.B.C. 658, 678 (S.D.N.Y.1978) (Bankruptcy Court). See also Norton Jr., *Real Property Arrangements Chapter XII, Federal Bankruptcy Act*, 99–100 (1977).

34. *Matter of KRO Associates, supra* at 672. See generally Kahn & Case, *Real Estate Appraisal and Investment* 121–123 (2d ed. 1977).

The capitalization rate employed by the witnesses varied: Mr. Rothschild, for the debtor applied a capitalization rate of 13.4%; Mr. Reuben, the Court-appointed appraiser used 12%; and Mr. Transom, the creditor's expert, chose a rate of 12.45%.

It is clear that the valuation of a property, using the capitalization-of-income-approach necessarily hinges upon the appraiser's subjective estimation of both net income (which is derived by deducting expected operating expenses and capital charges from expected future gross income) and a capitalization rate (the expected or anticipated rate of return needed to attract investment capital).[35] Accordingly, in this subjective field of property valuation, an appraisal necessarily implicates not only the talent and experience of the appraiser, but may often reflect, as well, the goals of the appraiser's client.[36] It can readily be seen, for example, that an increase in the estimated current expenses generated by a property, or a decrease in gross income, will result in a decreased net income and a lower property valuation. Conversely, a higher valuation of property can be obtained by concluding that a high estimated gross income is generated by the property in tandem with lower estimated expenses—thus increasing the net income. Therefore, in cases of valuation, for purposes of "cram-down", the Court quite expectantly receives a "low" valuation of the premises from the debtor and a "high" valuation by the creditor's appraiser. Moreover, the Court is attuned to those factors, just noted, in each of the appraisals, that often are programmed into the appraisal to best accomplish the particular client's goals. For this reason, this Court, when faced with a "cram-down" effort, normally appoints a disinterested appraiser.

After reading the three appraisal reports and the testimony of each of their authors, we conclude that the value of the subject premises is $1,750,000.

In reaching this conclusion we have attached little weight to the testimony of Mallard's witness, Mr. Rothschild. That witness, although appearing as debtor's expert appraiser, primarily is a mortgage broker. Even as a mortgage broker, the testimony reveals that he has not recently transacted business in commercial premises located in Manhattan. Although I am convinced that he is aware of the methodologies or tools of the professional appraiser, I find his appraisal more result-oriented than judgmentally informed.

Greenwich's expert, Mr. Transom, I found to be well-qualified with impressive credentials as an appraiser. In my view, however, that witness did not consider, let alone, factor in, what appeared to me, necessary expenditures for repairs which should be deducted from his appraised value of $1,800,000.

Of course, the Court appointed appraiser comes to the Court unfettered by any obligation, apparent or real, to any of the disputing parties. We necessarily must attach some significance to that factor. Reuben's appraisal concluded that the capitalized value of the building is $1,960,000 less $475,000 representing the cost of rehabilitation, or $1,585,000. Mr. Reuben testified, however, that his appraisal report contained the fact that there were several month-to-month tenancies covering 14,080 square feet. Reuben assigned to that space a frankly "conservative" figure of $8.50 per square foot. On the basis of the testimony adduced, a more realistic square foot rate would be within the range of—nine to ten dollars a square foot. As Mr. Reuben testified, this higher range would add about $160,000 to his appraised value. Thus, as stated above, we find the appraised value of debtor's property to be $1,750,000.

### (c)

### "Indubitable Equivalent"

▉ We observed earlier that before this Court may countenance a "cram-down" of its plan over the dissent of a secured creditor, or class of creditors, such plan must provide, in connection with the forced

---

**35.** Kahn & Case, *supra* at 122, 143.

**36.** *Id.* at 5.

feeding, a palliative which represents the "indubitable equivalent" of the security denied the dissenting creditor. It is well-established that where, as here, the value of the security exceeds the amount of the debt, in order to provide adequate protection to the creditor, the debtor must repay the debt in full.[37] Although we noted above that former Bankruptcy Act § 461(11)(d) countenances a modification or extension of the existing loan agreement, the Court must be satisfied that the debtor will have the ability to pay its debt in a manner that would not impermissibly allow the debtor to speculate with the Bank's funds.[38] This Court, however, notes that the debtor has been negotiating leases which have significantly increased its annualized rent rolls beyond the projections of both Greenwich's and the Court's appraisers. The testimony at the confirmation hearings indicates that the debtor, under its plan, can fulfill its obligations to repay its debt, at increased interest to the bank, while preserving the latter's lien on the subject premises.

### (d)

We accordingly find that Mallard's offer to Greenwich provides adequate protection to the secured creditor under the terms of former Bankruptcy Act § 461(11) and that the debtor's plan complies with the provisions of Chapter XII, is in the best interest of this creditor, and is feasible.[39] Moreover, we conclude that the debtor has complied with all other relevant provisions of former Bankruptcy Act § 472[40] and its plan is entitled to be confirmed.

**37.** *Matter of Pine Gate Associates, Ltd.,* 10 C.B.C. 581, 595–597 (N.D.Ga.) (Bankruptcy Court), *aff'd* 10 C.B.C. 613 (N.D.Ga.1976), *motion for leave to file petition for writ of prohibition denied, sub nom. Great National LIfe Ins. Co. v. Pine Gate Associates, Ltd.,* 429 U.S. 1071, 97 S.Ct. 825, 50 L.Ed.2d 799 (1977).

**38.** *Cf. In re Huntley Square Associates,* 2 Bankr.Ct.Dec. 1417 (D.Md.1976) (Bankruptcy Court) (relief from automatic stay provisions of Chapter XII).

**39.** The uncontradicted testimony at the confirmation hearing revealed that debtor's funds, and loans to the debtor from certain of its limited partners, are available and will be suffi-

### C

#### *Conclusion*

Mallard is directed to settle an order, on three (3) days notice, in conformity with the foregoing decision, which shall be deemed to constitute this Court's findings of fact and conclusions of law,[41] providing therein for the required deposit, the proper allowance to the Referee's Salary and Expense Fund and applications for compensation, if any.

cient to pay to Greenwich the sum of $265,987 on confirmation as well as other necessary administration expenses.

**40.** 11 U.S.C. § 872 (repealed). This section is applicable to confirmation of a plan, as here, which has not been accepted by all creditors (former Bankruptcy Act § 467).

**41.** Bankruptcy Rule 752(a), 411 U.S. 1082–1083, 93 S.Ct. 3158, 37 L.Ed.2d lxxii, this Court's procedural mate to Fed.R.Civ.P. 52(a), is applicable to contested matters, Bankruptcy Rule 914, 411 U.S. 1098, 93 S.Ct. 3170, 37 L.Ed.2d lxxviii.