In re GREENLEY ENERGY HOLD-
INGS OF PENNSYLVANIA,
INC., Debtor.

Bankruptcy No. 86–00056S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 12, 1989.

Edward J. DiDonato, Philadelphia, Pa., for trustee.

Susan Drogalis, Office of the U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

Joseph A. Dworetzky, Philadelphia, Pa., for Stone Faction.

Dominic Ciarimboli, Greensburg, Pa., trustee.

Timothy J. Hurley, Cincinnati, Ohio, for Dunn–Syphers Faction.

Mark Packel, Philadelphia, Pa., for Beth–Energy Mines, Inc.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

Presently at issue in this case is a subject that we have not previously addressed, *i.e.*, computations of trustees' commissions in a case under the Bankruptcy Code. This inquiry has led us to closely examine the pertinent Code provision, 11 U.S.C. § 326(a), for the first time. As a result, we conclude that our general approach to allowance of trustees' commissions in the past, which was that we would allow the sums computed under the formula set forth under § 326(a) unless we had reason not to do so, was in error. Actually, § 326(a) is merely an unconditional cap on such commissions, and, in the future, we

will insist that trustees submit an application in procedural conformity with *In re Meade Land and Development Co.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr.E.D.Pa. 1987), before we will allow them commissions in any case in excess of $500.00.

In this case, since we conclude that § 326(a) is an unconditional cap on the Trustee's commission, we are obliged to reduce the request for commission of $362,-500.00 by the Trustee here to $53,594.00.

The instant Chapter 11 case was filed on January 6, 1986. Prior to this filing, in the course of litigation in this district court between two factions of the Debtor's stockholders, Edward J. DiDonato, Esquire (hereinafter referred to as "DiDonato"), was appointed as receiver of the Debtor. DiDonato filed the instant bankruptcy petition as counsel for the Debtor.

The post-petition perpetuation of the previous factionalism led to an agreement of April 4, 1986, by, apparently, all interested parties, to the appointment of a trustee. On May 12, 1986, Dominic Ciarimboli, Esquire (herein "the Trustee"), an attorney whose main office is in Greensburg, Pennsylvania and who had previously acted as a trustee in the Western District of Pennsylvania, was selected as trustee, apparently by consensus. The firm in which DiDonato was a partner was appointed counsel to the Trustee on June 9, 1988.

Through the date of the bankruptcy filing, the Debtor's principal business was reprocessing coal refuse. In accordance therewith, the Debtor accumulated four large waste coal or "gob" piles. We are told that, after the prices of competitive fuels declined in the early 1980's, the Debtor's business greatly diminished, and its main asset, the gob piles, came to be viewed more as an environmental hazard and eyesore than as valuable property.

The Trustee, enlisting the assistance of his brother, Joseph P. Ciarimboli (hereinafter "Joe"), an engineer who had extensive experience in development of coal products, salvaged this apparently-bleak situation. Five interrelated agreements were ultimately negotiated by the Trustee with Babcock and Wilcox (hereinafter "B & W") whereby the Debtor would supply its coal refuse to a newly-formed B & W subsidy, the Ebensburg Power Co. (hereinafter "EPC"), on a long-term basis.

A Plan featuring these five agreements was ultimately supported by both factions of the Debtor's ownership and its creditors, and confirmed in a modified version on July 14, 1988. The Plan, in describing the reorganized Debtor, also expressly disclosed that the Trustee would serve as a director and an officer of the Debtor for at least five years, at compensation, beginning on January 1, 1991, of $36,000.00 annually, with increments of three (3%) percent per annum thereafter. Also, it was stated that Joe was to serve as the Debtor's Director of Operations, at a salary of $30,000.00 annually from the date of confirmation until January 1, 1991, and that, from that date forward, he would be hired for at least five years, at a salary of $60,000.00 annually, with increments of $3,000.00 per year thereafter.

On August 25, 1988, the Trustee filed the instant Application seeking a commission of $362,500.00. DiDonato's firm also filed requests for compensation as counsel for the receiver and for the Trustee, in the amounts of $33,783.86 and $95,996.50, respectively. No commission was sought by DiDonato as receiver *per se*, and we were advised that any such request was included in the Application for counsel fees for the receiver.

As justification for his request, it was alleged by the Trustee, in his Application, that the minimum gross receipts under the agreements between EPC and the Debtor over their 21–year minimum duration would be $28,102,335.00, on which figure the commission would compute to $840,-000.00. Hence, the Trustee claimed that, in seeking $362,500.00, he had agreed to accept a figure greatly reduced from that which he could receive strictly on the basis of § 326(a). Apparently, the Trustee's request had been the subject of negotiations, because the only objection to his request was a letter from one of the stockholder factions claiming that the agreement was

that the Trustee would accept $325,000.00. It was also stated in the Application that the Trustee had devoted 2,500 "man hours" to negotiation of the agreements and his other duties as trustee.

The court, nevertheless, felt a duty to determine the legal basis for what appeared to be a very large commission request. A hearing was scheduled on October 19, 1988, which was attended only by DiDonato, as the Trustee's counsel. Thereafter, we ordered that the Trustee file a written statement disclosing his duties performed, time spent, and future compensation to be received for him and his relatives from the Debtor on or before November 2, 1988, and we scheduled a hearing at which the Trustee was requested to appear personally on November 9, 1988.

The Report filed in response to this Order provided a generalized quantification of the Trustee's performance of his duties. While not providing anything near to the detail required by the standards set forth in *Meade Land, supra,* and *Mayflower, supra,* the Application stated that 3,600 hours had been expended by the Trustee "and his staff" since May, 1986. However, the claim of time of the Trustee expended personally was reduced from the previous claim of 2,500 hours to between 1,400 and 1,600 hours. The only specific statement of allocation of the duties performed was a narrative and the following breakdown of time spent by percentages as follows:

| | |
|---|---|
| Contract Negotiations | 46% |
| Shareholder Issues | 22% |
| Environmental | 11% |
| Operations | 21% |

The Trustee appeared and testified at the hearing on November 9, 1988. He contended, in a low-key but convincing presentation, that he had performed a "small miracle" in resolving the Debtor's problems. He stated that the mutual trust which all parties had in him had been crucial to success of his work-plan, and he contended that the participation of Joe and himself in the reorganized Debtor were conditions which had been insisted upon by EPC and both factions of the Debtor's shareholders. He stated that he had not maintained time records, but that his normal hourly rate was $150.00, and that he had personally expended over 1,600 hours, which, in itself, would factor out to a compensation award of almost $250,000.00. He computed that Joe had expended an addition 2,075 hours on the project without receiving any compensation.[1] Counsel for a large creditor, Beth–Energy Mines, Inc., appeared and spoke vigorously in support of the Application.

On that date, the Trustee also submitted a Statement of Position. This Statement de-emphasized the significance of the time expended by the Trustee and emphasized the commission formula of 11 U.S.C. § 326(a). While conceding a "paucity" of supporting precedent, the Trustee asserted that he was entitled to commission computed on "guaranteed revenues generated by Contracts which he has created," which sums have "been 'turned over' by the Trustee to parties in interest. See 11 U.S.C. § 326(a)." Statement of Position, at 1.

At this point, we performed our own research of 11 U.S.C. § 326(a), which provides as follows:

§ 326. Limitation on compensation of trustee

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

A comprehensive discussion of § 326(a) is contained in 2 COLLIER ON BANK-

---

1. We observe, however, that Joe was not appointed as a professional, pursuant to 11 U.S.C. § 327(a), as may have been feasible, nor was any application for compensation filed by Joe pursuant to 11 U.S.C. § 330(a).

RUPTCY, ¶ 326.01, at 326–2 to 326–28 (15th ed. 1988). That section is said to have been " 'derived in part from section 48c of the Bankruptcy Act,' " former 11 U.S.C. § 76(c). *Id.* at 326.01[2] at 326–6 (quoting H.R.REP. NO. 595, 95th Cong., 1st Sess. (1977); and S.REP. NO. 989, 95th Cong., 2d Sess. 37–38 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5823–5824. The principal change effected in the Code, as opposed to the Act, is abolition of allowance of a double commission when, as here, the trustee actually conducts the debtor's business. *Id.*, ¶ 326.03, at 326–12 to 326–13. The other changes referenced there are as follows: (1) Reduction of the minimum commission of $150.00 to, first, $20.00, and, presently, to $45.00. *Id.* at 326–14; (2) Doubling of the bases to $1,000.00; over $1,000.00 to $3,000.00; and over $3,000.00, respectively.[2] *Id.;* (3) The percentage on the first base was raised from ten (10%) percent to fifteen (15%) percent. *Id.* at 326–14 to 326–15; and (4) In contrast to Chapter X of the Act, "the Code limits compensation payable to a trustee in a Chapter 11 reorganization case to the same maximum compensation payable in a Chapter 7 liquidation case." *Id.* at 326–15.

This latter quotation reiterates a point made earlier by Collier:

the trustee is never entitled to maximum compensation as a matter of right and the amount of compensation, *within the maximum rate,* is subject to the discretion of the court in light of the reasonable value of the services (emphasis added).

*Id.,* ¶ 326.01, at 326–5. The "reasonable value of the services" is measured pursuant to 11 U.S.C. § 330(a), to which § 326(a) specifically makes reference, *see id.* at 326–3, and which reads as follows:

§ 330. Compensation of officers

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

In this district, it is well established that any application pursuant to 11 U.S.C. § 330(a) must be in procedural conformity with *Meade Land, supra.*

We confess that many of our past allowances of trustee's commissions have not been in accordance with these principles. Rather, we approached trustees' requests for commission as if the formula set forth in § 326(a) established a sum to which the trustee was entitled, unless there was a reason to reduce that sum. Not only was this an error, but it was directly contrary to legislative history stating that the § 326(a) formula

simply fixes the maximum compensation of a trustee. Under section 48c of the current law, the maximum limits have tended to become minimums in many cases. *This section is not intended to be so interpreted.* The limits in this section, together with the limitations found in section 330, are to be applied as *outer limits, not as grants or entitlements to the maximum fees specified* (emphasis added).

---

**2.** We note that, under § 326(a) as it read prior to the 1984 amendments, the maximum commission allowable on amounts in excess of $3,000.00 was three (3%) percent on any amount between $3,001.00 and $20,000.00; two (2%) percent on any amount between $20,- 000.00 and $50,000.00; and one (1%) percent on any amount over $50,000.00. In a large case like the instant matter, the difference is substantial. Under the pre–1984 formula, the Trustee's commissions in this case would be only $18,-744.66.

H.R.REP. NO. 595, *supra,* at 327; S.REP. NO. 989, *supra,* at 37–38, U.S.Code Cong. & Admin.News 1978, pp. 5823–5824, 6283.

This language has been said to be "unequivocal" and "as plain as day," *In re Roco Corp.,* 64 B.R. 499, 502 (D.R.I.1986), in dictating that § 326(a) provides a maximum limitation as opposed to a normative computation of trustees' commissions, and as indicative of the legislative committee's going to "great lengths to point out" that the previous commission formula "was, unfortunately, frequently considered a minimum, but it was really intended as a maximum." *In re Garland Corp.,* 8 B.R. 826, 832–33 (Bankr.D.Mass.1981). *Accord, e.g., In re Bill Glass Bicycles, Inc.,* Bankr. No. 86–02947G, slip op. at 2, (Bankr.E.D.Pa. May 4, 1987) (per FOX, J.); and *In re Dinsmore Tire Center, Inc.,* 81 B.R. 136, 137 (Bankr.S.D.Fla.1987). Unfortunately, in the past, we have tended to treat the § 326(a) formula as a minimum, rather than, as the authorities cited above point out it should be, as a maximum in determining trustees' commissions. Also, we did not require trustees to submit any applications in conformity with § 330(a) and *Meade Land* as a condition for allowance of their compensation.

In the future, we note that we must and will require trustees to submit applications, pursuant to § 330(a), in conformity with *Meade Land,* as a condition for receipt of any commissions in excess of $500.00. Since applications for amounts less than this sum do not have to be heard, *see* Bankruptcy Rule 2002(a)(7), no applications will be required where trustees disburse and turn over less than about $80,000.00, which computes to a commission of $500.00 under the § 326(a) formula. However, applications will be a precondition to compensation in all other cases.

Our conclusions as to how § 326(a) must be interpreted settle one of the issues in this case. Our inquiry into the duties performed and hours spent by the Trustee here was appropriate. Establishment of entitlement to fees, under the criteria of § 330(a), was a prerequisite to the not complied with *Meade Land* in documenting his application. However, that requirement has been expressed only in this very Opinion, and thus the Trustee has some justification for not doing so. This justification will, of course, not apply to applications for trustees' commissions requested for services performed after the date of this Opinion. Furthermore, here, the Trustee's claims would support a commission, based on an hourly rate per *Meade Land,* far in excess of the maximum allowable under § 326(a). Therefore, in this case, we have no hesitancy in concluding that the Trustee's request meets the requirements of § 330(a).

The Trustee's commission is, however, definitely limited by the terms of § 326(a). The next question is whether there is any merit in the Trustee's position that we can consider the sums guaranteed by the agreements between EPC and the Debtor among the "moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims," as per the precise language of § 326(a).

Collier includes some discussion on the scope of the phrase quoted in the foregoing sentence, focusing on disbursements to secured claimants, *id.,* ¶¶ 326.01[4][a], [b], [c], at 326–216 to 326–24, and disbursements of liquid commodities other than cash. *Id.,* ¶ 326.01[4][d], at 326–24 to 326–28.[3]

A split of authority unresolved by the Code is acknowledged by Collier on the issue of whether any liquid assets other than cash can be considered as "moneys" disbursed. 2 COLLIER, *supra,* ¶ 326.01[4][d], at 326–28. *Compare In re*

---

**3.** It is pointed out there that the policy of this court in not allowing trustee to receive a commission on the sale of fully secured property is widely supported. *See In re Lambert Implement Co.,* 44 B.R. 860, 861–62 (Bankr.W.D.Ky.1984); *In re Crisp,* 26 B.R. 274, 275 (Bankr.W.D.Ky. 1982) ("Bluntly put, a trustee is not entitled to collect his commissions from secured property administered in bankruptcy."). *Accord,* 2 COLLIER, *supra,* ¶ 326.01[4][a], at 326–16 to 326–17 n. 35. *Cf. In re Land,* 82 B.R. 572, 578–80 (Bankr.D.Colo.1988) (Chapter 12 trustee is not entitled to a commission on payments made by the debtor directly to creditors); and *In re Wright,* 82 B.R. 422, 423–24 (Bankr.W.D.Va. 1988) (same, as to a Chapter 13 trustee).

*Toole,* 294 F. 975 (2d Cir.1920) (calculation of commission held to properly include the value of securities turned over to claimants of debtor-stockholders), *with In re Morris Bros.,* 8 F.2d 629, 630 (D.Or.1925) (only cash turned over can be considered as such "moneys").

Having reviewed the foregoing authorities, we entered an Order of December 5, 1988, in this case, in which we indicated that we were allowing compensation to DiDonato's firm as counsel for the receiver and the Trustee, in the amounts of $18,844.00 and $90,641,00, respectively. However, we asked the said counsel, in partial return for these awards, to supply us with a Report of all moneys disbursed or turned over by the Trustee to date. Suggesting that the sum recited in this Report must be the sole basis for calculating the Trustee's compensation, we then posed the following questions:

It appears to the court that compensation is limited to only those funds actually disbursed or paid over. *See In re Palm Beach [sic] Resort Properties, Inc.,* 73 B.R. 323, 324 (Bankr.S.D.Fla.1987); *In re New England Fish Co.,* 34 B.R. 899, 900–02 (Bankr.W.D.Wash.1983); and *In re Garland Corp.,* 8 B.R. 823, 632–34[826] (Bankr.D.Mass.1981).

What authority, if any, exists for allowing compensation for funds disbursed or turned over by the Trustee after confirmation, in light of 11 U.S.C. § 1141(e) [sic—meant § 1141(b)]?

If the answer to the foregoing is that authority exists for allowing compensation for funds disbursed after confirmation, at what point is it believed that the Trustee's right to compensation should cease, considering:

(1) Any applicable law?

(2) The terms of the Modified Plan?

(3) The fact that the Trustee will receive compensation from the reorganized company; does this create a conflict?

Any other relevant information, arguments, or authorities.

Counsel timely filed a Summary of Disbursement by the Trustee, indicating that, as of December 15, 1988, $1,789,466.63 had been disbursed by the Trustee. Many of the latter payments were disbursements of December 2, 1988, according to the Plan. Therefore, we can fairly consider all of these disbursements as having been "disbursed or turned over in the case by the trustee."

In addition, a lengthy and thoughtful Memorandum of Law was submitted by the Trustee's counsel. Unfortunately, except for the comments on the potential conflict issue, the Memorandum failed to convince us to adopt the arguments presented therein.

The first argument made, citing to *Toole,*[4] is that the sums guaranteed by the agreements between EPC and the Debtor were the equivalent of "moneys" and therefore should be considered in the calculations. We do not agree that *Toole,* even if we chose to follow it, would be decisive of this point in favor of the Trustee, for at least three reasons. First, § 326(a) expressly excludes consideration of disbursements to the debtor. Entry of the order confirming the Plan "vests all of the property of the estate in the debtor." 11 U.S.C. § 1141(b). The Modified Plan confirmed in this case does not contain any provision continuing the Trustee in place subsequent to confirmation. Therefore, it appears to us that agreements with EPC, and all of the benefits which will prospectively flow therefrom, have been turned over to the Debtor by the Trustee. It is only in their capacity as a post-confirmation director and officer and employee, respectively, of the Debtor that the Trustee and Joe are involved in their effectuation. In *Toole,* by way of contrast, the securities in issue were distributed to claimants.

Secondly, as the later decisions cited by the Trustee in *In re Allied Owners Corp.,* 79 F.2d 187, 190 (2d Cir.1935) (also penned by Augustus N. Hand); and *In re Lehrenkrauss,* 16 F.Supp. 792, 793 (E.D.N.Y.

**4.** The *Toole* Opinion is erroneously attributed, in the Memorandum, to Learned Hand. The author was actually Augustus N. Hand.

1936), point out, the holding of *Toole* is limited to distribution of securities, a very liquid commodity. In *Allied Owners* and *Lehrenkrauss*, the respective courts rejected the argument that mortgages, even conceding that proceeds were "guaranteed" therefrom, could be considered as "moneys." *Allied Owners*, especially, is an express limitation on any broad reading of *Toole*. Here, what are involved are agreements which are, if anything, less liquid than mortgages. They are, in our view, in no way comparable to securities, let alone cash, in liquidity.

Finally, the Trustee emphasizes the language in *Toole*, which he doubtless contends applies equally here, that imposing strict limitations on commissions of trustees will discourage any "competent person" from "wisely accept[ing] the office of ... Trustee," 294 F. at 976, or at least from doing so in any manner other than in a perfunctory fashion, thus discouraging trustees from "wasting" their time in imaginative resolutions of problems posed by estates which they are managing. However, in *Allied Owners*, Judge Hand reiterates that, irrespective of policy reasons which might be articulated to the contrary, "section 48a fixes the bounds of fees which trustees in bankruptcy can claim" and that the court is not "free ... to fix conclusively any allowance it might deem reasonable" outside of the statutory bankruptcy scheme. 79 F.2d at 189. As the courts and Collier have uniformly expressed in recognizing that § 326(a) places a *maximum* on trustee's commissions, we cannot alter the absolute boundaries of the Code. We do not have such a dim view of humanity that we are prepared to conclude that the only incentive for constructive human behavior is monetary. Besides, the end result here, either through structure or by chance, bestows a not inconsiderable monetary benefit upon the Trustee and his brother above and beyond the commission.[5] We must assume that Congress weighed the competing social policies, including maximizing payments to creditors from debtors' estates, and consequently chose the statutory scheme that it did as the proper means of reconciling these policies.

The Trustee next cites to a number of cases where courts have declined to follow the literal language of § 326(a), excluding all disbursements to debtors from consideration in computing commissions, when debtors have voluntarily dismissed cases, thereby requiring that most moneys held by the trustee be returned to the debtor. *See In re Flying S Land & Cattle Co.*, 23 B.R. 56 (Bankr.C.D.Cal.1982); *In re Rennison*, 13 B.R. 951 (Bankr.W.D.Ky.1981); and *In re Wolfe*, 12 B.R. 686 (Bankr.S.D.Ohio 1981). However, these cases appear to be guided by the equitable conditions which are appropriately placed upon the bankruptcy court's allowing a voluntary dismissal of a case. *See In re Rose*, 86 B.R. 439, 441–42 (Bankr.E.D.Pa.1988); and *In re Geller*, 74 B.R. 685, 691 (Bankr.E.D.Pa. 1987). However, such considerations are not in issue here, since no dismissal of the case is sought. The Trustee can cite no case not involving dismissal which contradicts the principles recited in *Palm Beach Resort Properties, New England Fish Co.*, and *Garland Corp., supra:* commissions may be computed only upon moneys actually disbursed or paid over by the Trustee during his tenure.

The Trustee, finally, argues that he is entitled to a bonus in light of the tremendous results which he accomplished and contends that he may be awarded same in addition the commission allowable under § 326(a). However, we believe that it is implicit in the conclusion that § 326(a) provides an absolute maximum of allowable commissions that § 326(a) forecloses the potential of payment of any bonuses in addition to the trustees' commissions allowable under its terms. As the court points out in *In re Clark Smathers Lakeville Manor, Ltd.*, 38 B.R. 319, 322 (Bankr.E.D.

---

5. The combined salaries of the Trustee and Joe, over the 1991–1996 period, will exceed $500,-000.00. Additional compensation after 1996, at even more lucrative levels, may be in the offing. If profits to be realized over 21 years are to be considered in the commission calculation, it would seem equally logical to consider salaries to be paid to the Trustee and his brother over this period as part of the commissions to be received by them.

N.Y.1984), the Bankruptcy Code abolished the pre-Code concept of bonuses such as permitting double compensation awards for operating trustees. The *Clark Smathers* court suggests that the allowance of double compensation was replaced by reasoning that "[t]o the extent an operating trustee brings additional funds into the bankruptcy estate, his compensation will be enhanced proportionately." *Id.*

All of the cases cited by the Trustee in support of his claim for a bonus concern applications of professional persons *hired* by trustees or by other parties. They do not concern applications of trustees in reference to their *own* commissions. Professionals are not controlled by the express limitation placed upon trustees' commissions by the terms of § 326(a). *See, e.g., In re Aminex Corp.,* 15 B.R. 356 (Bankr.S. D.N.Y.1981) (in case under Chapter XI of Bankruptcy Act, receivers were allowed only their statutory commissions, 15 B.R. at 358–59, although their counsel was awarded a premium, *id.* at 361–64).

The final issue, which we raised in our Order of December 5, 1988, is whether the arrangement to employ the Trustee and Joe might have constituted a conflict of interest, which would negatively impact any request for commissions. *See Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951) (trustee surcharged for profits made by two of his employees in the trusteeship during administration of the estate); *Woods v. City National Bank & Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941) (even "innocent' conflict by a fiduciary such as the trustee eliminates any claim for compensation); *Donovan & Schuenke v. Sampsell,* 226 F.2d 804, 810–11 (9th Cir.1955) (neither trustee nor his agents could purchase property which trustee is empowered to sell, even though no profits were made or illicit motives were found); and *In re Airlift International, Inc.,* 92 B.R. 550 (Bankr.S.D.Fla. 1988) (trustee's becoming a member of the board of directors of the reorganized debtor "would place himself in a position of the appearance of a conflict of interest, which public policy cannot allow."). It is clear that the future compensation arrange-

ments of both the Trustee and Joe were candidly set forth in both the Plan and the Disclosure Statement and, according to the Trustee, were not only allowed but actively supported by both factions of the Debtor's stockholders, EPC, and the creditors as the adhesive which kept together the entire mutually-beneficial transaction. While it is not a precedent that we would want to encourage beyond the instant unusual factual setting, it does appear that, when such an arrangement is actively consented to by all interested parties, and there is no objection, it can be tolerated. *But see Airlift International, supra.*

Keeping in mind that this arrangement will handsomely compensate the Debtor and his brother, we feel quite comfortable with our inevitable result that we must limit the commission of the Trustee here, like any trustee, to that provided by § 326(a). As a result, the Trustee's commissions must be computed by applying the bases set forth in § 326(a) to the figure of $1,789,466.63, which constitutes the moneys disbursed or turned over to the Trustee in the case. The maximum allowable commission, based on this figure, is $53,594.00.

That is the commission which we will allow to the Trustee in a separate Order.