## In re GREENLEY ENERGY HOLDINGS OF PENNSYLVANIA, INC.

### Civ. A. No. 89–1473.

United States District Court, E.D. Pennsylvania.

July 5, 1989.

David Fishbone, Edward DiDonato, Philadelphia, Pa., Aris J. Karalis, for trustee.

Dominic Ciarimboli, Greensburg, Pa., trustee.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

### OPINION AND ORDER

VANARTSDALEN, Senior District Judge.

#### Background

The trustee, Dominic Ciarimboli, has appealed from the January 12, 1989 final order of the bankruptcy judge denying his application for fees of $362,500.00. 94 B.R. 854. This court has jurisdiction to consider this appeal pursuant to 28 U.S.C. § 158(a). The issue presented on appeal is whether

---

guaranteed contracts may qualify as "moneys turned over" under 11 U.S.C. § 326(a), and thereby have their value used as the basis for an award of trustee compensation. Since this is a question of law, this court's review is plenary. *See Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–03 (3d Cir.1981). For the reasons stated, the Trustee's application for fees will be granted, and the decision of the bankruptcy judge will be reversed.

Greenley Energy Holdings of Pennsylvania, Incorporated (Greenley), which is now in bankruptcy, has been at the center of a series of lawsuits and litigation.[1] A major part of the litigation took place before me in *Syphers v. Scardino*, No. 85–3696, 1985 WL 4283 (E.D.Pa.1985). On December 5, 1985, I appointed Edward DiDonato as a receiver for Greenley with the faint hope that he could preserve the assets of Greenley and extricate the corporation from its apparently insurmountable problems. *See id.* at ¶¶ 18–42. At the time of the appointment, I realized that there was a strong possibility that the receiver would not be compensated at all given the terrible financial condition of Greenley. On January 6, 1986, I granted the receiver's motion to protect Greenley's assets by filing a petition under Chapter 11 of the Bankruptcy Code.

On May 12, 1986, the bankruptcy court appointed Dominic Ciarimboli, Esquire, as trustee. The trustee had served as trustee in a number of cases originating in the Western District of Pennsylvania and was experienced in the area of coal and mineral rights. When the trustee took control of Greenley, it had, for all intents and purposes, ceased operating. Greenley had been operating as a re-processor of coal refuse. However, due to changes in the fuel marketplace, the refuse coal held by Greenley (referred to as gob piles) became nearly worthless. In addition, the gob piles became an environmental hazard and Greenley was confronted with serious environmental violations. Greenley was being fined $750 per day by the Department of Environmental Resources (DER) and was obligated to do a massive reclamation project which would cost, according to DER, an estimated thirty million dollars.

The trustee then worked what a major secured creditor of Greenley termed as a "small miracle." *In re Greenley Energy Holdings*, Bankr. No. 86–565(11), Transcript at 3–4. Counsel for secured creditor Beth Energy stated:

> When the case began and I met with my client, we had little hopes that there was going to be any money coming out of this estate to secured creditors, let alone unsecured and other creditors. We were almost convinced that all we were going to end up with was the gob piles and then it would be our problem and we were quite amazed when the trustee was able to come up with this proposal, which from what I've seen is worth approximately $30 million, provides for the payment of all classes of creditors and at least appears to create a viable entity going forward which would be for the good of the community as well as creditors of this estate. Obviously my client, because—on the effective date of the plan will be paid its claim as agreed to in full, we have no interest in what the trustee would be receiving from the estate, we still think that it's important to point out to your Honor that—I mean really what's occurred here appears to be a small miracle. And to the extent that your Honor is aware of that and can take that into consideration in the determination of the trustee's fees, I think that should be done.

*Id.*

The trustee developed a business plan that would pay secured and unsecured creditors 100% of their claims according to a negotiated schedule. In addition, shareholders would receive a return on their investment. In order to accomplish this result, the trustee searched for possible users of Greenley's coal. The trustee enlisted the assistance of Joseph P. Ciarimbo-

---

1. *See In re Universal Minerals, Inc.*, 755 F.2d 309 (3d Cir.1985); *Syphers v. Scardino*, 802 F.2d 448 (3d Cir.1986) *aff'g Syphers v. Scardino*, No. 85– 3696 (E.D.Pa. Dec. 5, 1985), 1985 WL 4283; *In re Greenley Energy Holdings of Pennsylvania, Inc.*, 94 B.R. 854 (E.D.Pa.Bankr.1989).

li, an engineer with extensive experience in the development of coal products. The trustee and Joseph Ciarimboli sought out corporations that might be interested in attempting to convert bituminous waste coal into power. Westinghouse, Babcock and Wilcox, Combustion Engineering, and a German corporation were interested in making such a novel attempt. However, Babcock and Wilcox was chosen because, relatively speaking, it had the most experience with this innovative energy production technology.

The trustee negotiated five interrelated agreements with Babcock and Wilcox whereby the debtor would supply a newly-formed Babcock subsidiary, Edensburg Power Company (EPC), with coal on a long term basis. The trustee also had to obtain shareholder approval for the plan. This accomplishment was not a trivial one in part because there were two shareholder groups that had an acrimonious and litigious relationship. *See Syphers v. Scardino*, No. 85–3696 (E.D.Pa.1985). The shareholders and EPC conditioned the signing of the Greenley contracts upon the trustee being retained as the fifth director of the corporation, and Joseph Ciarimboli being retained as director of operations. The shareholders wanted directors whom they could trust, and EPC desired management continuity so as to avoid the type of pre-bankruptcy litigation that left Greenley in shambles.

The trustee filed an application for commissions of $362,500.00. The trustee stated that he negotiated contracts between EPC and the Debtor that will generate minimum gross receipts for Greenley of $28,102,335.00. The stream of income received by Greenley is derived from two primary sources. First, Greenley will receive consideration of $550,000 per year for a minimum of 21 years for allowing EPC to dispose of coal residue on Greenley's land. This $550,000 figure will escalate at 3% per year. Second, there is a service agreement whereby Greenley will provide a minimum of 100,000 tons of coal to EPC per year at $9 per ton. The 100,000 tons is a minimum, and Greenley may be permitted to provide EPC with more coal which would result in more revenue for Greenley.

The trustee has taken a business that had completely ceased functioning and turned it into one with a viable future by creating contracts which will turn Greenley's coal into a source of energy by using an innovative method. The trustee has not only performed a direct service to Greenley's secured and unsecured creditors and its shareholders, but he has set up the framework for the elimination of a serious environmental hazard in the State of Pennsylvania. Such an accomplishment cannot be underestimated, especially considering the checkered past of Greenley Energy Holdings.

### Decision Below

The bankruptcy court refused the trustee's application for fees in the amount of $362,500.00. I should state initially, given the results obtained by the trustee over this two and one-half year period, and that all creditors and all shareholders have agreed (or at least have expressed no objection) to the trustee's commissions, the bankruptcy judge should not have denied the fee application without a very good reason. It is true that a bankruptcy judge has an obligation to review attorney and trustee fee petitions even if there is no objection since creditors who are in need of protection may not be represented. However, where all creditors are to be paid in full and shareholders are receiving a return, there is a strong argument for approval of the trustee fees agreed to by the parties.

### Discussion

Of course, the granting of trustee fees must be authorized under the Bankruptcy Code. Section 326(a) of the Code authorizes compensation for trustees; it states:

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on

any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

Section 330 of the Code states, in part:

**Compensation of officers**

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

Thus, trustee fees are subject to two separate limitations. First, section 330(a) allows a trustee "reasonable compensation" based on the nature, extent, and value of such services including necessary fees for persons employed by the trustee. Second, section 326(a) works to put a cap on trustee compensation in excess of a specified amount determined by a formula in that

section. For example, a fee of $100,000 might be reasonable under the standards of section 330(a), but the section 326(a) formula might place a cap on compensation of $80,000.00. In such a case, the maximum that a trustee could receive would be $80,000.00. *See* 2 Collier on Bankruptcy, ¶ 326.01 (15th ed. 1988).

The bankruptcy court found that the trustee fees based on a reasonable hourly rate would far exceed the maximum fee allowable under section 326(a) as he interpreted the statute and therefore focused primarily on the cap pursuant to section 326(a). The bankruptcy court awarded total trustee fees of $53,594.00, that purportedly is the product of the application of the percentages applicable under section 326(a) to the base figure of $1,789,466.00.[2] The bankruptcy court concluded that $1,789,466 were the total funds disbursed or turned over by the trustee. *See* Appeal Record, Exhibit 12. Since I conclude that the proper base amount should be the sum of $1,789,466 plus the present value of the $28,102,355 in guaranteed contracts, I must also consider whether the negotiated fee award is reasonable under section 330(a).[3]

█ The trustee stated that his hourly rate was $150.00. This rate is reasonable given the specialized experience of the trustee. The trustee testified that he worked 1602 hours on the case. Applying 1602 hours to an hourly rate of $150 gives a lodestar amount of $240,300.00. The difference between $240,300 and the negotiated fee is $122,200.00. This figure may then be divided by 2075 hours, representing the number of hours worked by Joseph

2. The bankruptcy court's calculations appear to be incorrect. The bankruptcy court used a base figure of $1,789,466.00, which is the amount of funds disbursed or turned over by the trustee exclusive of the guaranteed contracts of $28,102,355.00. However, the bankruptcy court's base figure would generate a fee of $53,864.00. The calculation is as follows:

| | Fee Amount |
|---|---|
| (1) 15% of the first $1,000 | $ 150.00 |
| (2) 6% of the amount in excess of $1,000 but not to exceed $3,000 | 120.00 |
| (3) 3% of any amount in excess of $3,000 ($1,789,466 − $3,000 = $1,786,466) | $53,594.00 |
| TOTAL | $53,864.00 |

3. The appellant has not included a calculation showing the present value of $28,102,355.00. However, it is clear that this present value figure based on a reasonable discount rate would lead to a base amount, which when multiplied by 3%, would exceed the negotiated amount of attorney's fees of $362,500.00. Therefore, the negotiated amount of $362,500 may be used since it does not exceed the cap amount specified in section 326(a).

Ciarimboli, as the director of operations for Greenley, providing a rate of $59 per hour.[4] Fifty-nine dollars per hour is obviously lower than what Joseph Ciarimboli could command as a consultant in the marketplace and is clearly reasonable in this instance.

### Funds Turned Over

■ The trustee argues that the value of the guaranteed contracts can be considered money turned over pursuant to section 326(a). I agree. The trustee negotiated and created contracts that will be used to pay secured and unsecured creditors as well as shareholders. The bankruptcy court concluded that "moneys" turned over means only cash. I do not interpret the statute so narrowly under the facts of this case. I conclude that the guaranteed contracts can be considered money in some instances. Unlike a situation where a trustee merely turns property originally possessed by the debtor back to the debtor, these guaranteed contracts did not exist prior to the trustee's actions. To hold that the trustee is required to turn over cash to the debtor before he may receive a fee would create perverse incentives. The trustee here could have put Greenley up for sale, obtained cash, then passed it onto creditors. *See* Norton Bankruptcy Law and Practice, § 53–14 at 17 (1988).

To deprive the trustee of fees generated on the basis of the present value of the guaranteed contracts would be unjust and could create incentives for other trustees to structure reorganizations in ·a way that provides maximum cash payouts to creditors and shareholders but sacrifices advantageous long term contracts. This would be contrary to the basic goals underlying bankruptcy law, that is, the protection of creditors and successful reorganization of the debtor. *See In re Mckeesport Steel Castings Co.*, 799 F.2d 91, 94–95 (3d Cir. 1986) (court permitted recovery of administrative expenses recognizing the impor-

tance of preservation of the debtor's business as a going concern noting that this "permitted the sale of assets as a going concern which provided a greater return to the secured parties than they would have received in other circumstances."). This same conclusion was reached many years ago in *In re Toole*, 294 F. 975 (2d Cir.1920), where Judge Hand stated:

> [T]he amendments to section 48 of the Bankruptcy Act should be treated as so enlarging the scope of the act as to allow compensation to trustees and receivers for all property properly administered by the bankruptcy court, irrespective of whether it turns out to belong to the general estate or not ... I think it also reasonable to suppose that the words "or turned over" are sufficient to include property at the value received, as well as moneys disbursed.

The Third Circuit came to a similar conclusion in *In re Prindible*, 115 F.2d 21, 23–24 (3d Cir.1940). There the court stated: "The cost of protecting a fund in court is a dominant charge against the fund." The court went on to note that "the trustee must show some act of administration with respect to encumbered property in order to be entitled to compensation." *Id.* at 24.

In this instance, the trustee did not merely protect the property of the estate, but created new property, the guaranteed contracts. To then say that administration expenses cannot be obtained on that property would be unjust given that the creditors and stockholders have obtained the benefits of the trustee's actions. The fact that the trustee created the fund is of importance, and serves to distinguish this case from one where the trustee merely turns the debtor's own property back to the debtor. *Cf. In re Brigantine Beach Hotel Corp.*, 197 F.2d 296 (3d Cir.1952) (the principal asset of the estate, the beach front hotel, which was turned back to debtor,

---

**4.** Joseph Ciarimboli, the expert retained by the trustee, has not yet been compensated. The trustee's fee request includes an amount which must be paid to Joseph Ciarimboli. Section 330(a) of the Code permits a trustee to be compensated for his labor and permits the trustee to

move for the compensation of "any paraprofessional persons employed by such trustee ... based on the nature, the extent, and value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title."

could not be used as a basis on which to calculate compensation).

The guaranteed contracts have been constructively disbursed to creditors and therefore have been "turned over" to creditors. The contract funds thus qualify as being money turned over to the estate upon which trustee's commissions may be based pursuant to section 326(a). The valuation of the contracts should be at their present value because that is the amount which is presently being constructively turned over to creditors and shareholders. *See In re Carden*, Bankr.L.Rep. ¶ 60,104 (S.D.N.Y. Dec. 22, 1960) (trustee may be able to receive commissions upon the discounted value of future payments).[5]

### Time Records

■ The bankruptcy court stated that any future applications for attorney's fees must meet the criteria established by the Third Circuit in *In re Meade Land and Development Co.*, 527 F.2d 280 (3d Cir. 1975). However, the bankruptcy court then proceeds to misread the requirements of *Meade Land*. In *Meade Land*, the fees sought were attorney fees and not trustee fees. This difference is significant because a trustee typically performs functions different from the average attorney. For example, an attorney working on a discrete matter, such as relief from the automatic stay, may more easily time the work being done so that it may be billed to a particular client. However, a trustee entrusted with the difficult task of running a failing business may have many on-going functions to perform. Further, the trustee may be involved in more than one trusteeship along with other business engagements. To require the trustee to keep detailed time records traditionally required to be kept by attorneys seeking fees would be unduly burdensome. Such a requirement while desirable in the abstract is not without real world costs. Not only do detailed time reports consume additional trustee time, but it might also force the trustee to deal with trusteeship matters on a more rigid schedule, that is, the trustee might be forced to block his time and only handle trustee matters at certain times. This could have detrimental effects on a debtor's business since many practical business problems which arise require prompt resolutions, and cannot be forced to arise only at specialized times.

The above considerations were obviously not lost upon the Third Circuit when it concluded that even where the claim was by an attorney for attorney's fees, the traditional requirements of *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp. (Lindy I )*, 487 F.2d 161 (3d Cir.1973), and its progeny did not have to be met. *See Meade Land*, 527 F.2d 280 (3d Cir.1975). In *Meade Land* the court stated: "When the Bankruptcy Judge finds that good cause exists for the nonproduction of the records, he may rely on some alternative form of proof along with his own articulated knowledge of the matter." *Id.* at 283–84; *see also In re Doctors*, 4 B.R. 346 (Bankr.E.D.Pa.1980) ("There was no duty on the trustee to keep an accurate record of hours he spent in performing duties as a fiduciary, and his estimate of time spent has probative value in determining the commissions to be awarded to him.").

Since an application for attorney's fees need not meet the strict *Lindy I* standards, nor does an application for trustee's fees, such a strict requirement would appear to be counterproductive. This fact has been recognized by other courts. In *Wall v. Wilson*, 77 B.R. 552 (Bankr.N.D.Tex.1987), the bankruptcy court stated:

> While it might be desirable for a Trustee to have the same type of time records as are presented in connection with an application for attorney's fees, this Court does not feel that a Trustee in order to recover compensation upon which there are maximum limits by the statute should be held to the same record-keeping requirements as an attorney. Attorneys' time can readily be identified to a particular project, but the Trustee's time is spread through the entire case. Here the Trustee was not engaged in a liqui-

---

5. *See supra* note 3.

dation, but rather a reorganization and continuing operation of a going business. The Trustee occupies the position of a chief executive officer of a business which requires a myriad of items over the course of the business day. It is not realistic to expect the Trustee to prepare a time slip on each function that he performs during the day. The evidence showed that the business office of the Debtor was located adjacent to the Trustee's law office and throughout the day, questions and problems are presented to the Trustee on an informal basis by members of the business office staff. It is certainly more efficient for them to be able to present these to the Trustee when the questions arise rather than having to stop work on that particular matter until the Trustee could be consulted at a later time.

The trustee achieved extremely favorable results and should be appropriately compensated. The Bankruptcy Code itself demands results, since the trustee's compensation is limited to a percentage of the money turned over, regardless of the amount of time spent on the case. *See* 11 U.S.C. § 326(a). "Success is the test applied by the business world in measuring compensation. It is largely so in the courts. As a rule, professional services which yield no results, command no high reward." *In re Doctors*, 4 B.R. at 348. The four other factors considered in determining the reasonableness of the trustee fees are: (1) the time spent, (2) the intricacy of the problems involved, (3) the amount involved, and (4) the opposition encountered. *Id.* at 347.

The time spent by the trustee was reasonable and the hourly rate the trustee will in effect receive is reasonable given the intricacy of the Greenley matter. Greenley was a company beset by litigation. To reorganize, or to put it more appropriately, to resurrect a company that ceased operation was, under the circumstances, a significant task. The trustee reorganized Greenley by finding a buyer for Greenley's services, and convincing a buyer to select Greenley as a supplier for its cogeneration plant.

*Conclusion*

The bankruptcy judge expressed concern over the amount of the fee in spite of the fact that those in perhaps the best position to judge the reasonableness of the fees, creditors and shareholders, agreed to the amount. The bankruptcy judge dismissed the argument of the trustee that competent persons would not accept the office of trustee if they were not going to be justly compensated, stating: "We do not have such a dim view of humanity that we are prepared to conclude that the only incentive for constructive human behavior is monetary." However, the trustee's concern was recognized by Congress. Congress concluded that it was more desirable to compensate attorneys and trustees involved in bankruptcy at a rate equivalent to what could be earned elsewhere in the profession, even though it might appear, at least in the short run, to better serve the interests of bankruptcy law to compensate at a lower rate. The House Report to the Judiciary stated:

The compensation is to be reasonable, for actual necessary services rendered, based on the time, the nature, the extent, and the value of the services rendered, and on the cost of comparable services other than in a case under the bankruptcy code. The effect of the last provision is to overrule *In re Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817 (9th Cir.1976, as amended 1977), which set an arbitrary limit on fees payable, based on the amount of a district judge's salary, and other, similar cases that require fees to be determined based on notions of conservation of the estate and economy of administration. If that case were allowed to stand, attorneys that could earn much higher incomes in other fields would leave the bankruptcy arena. Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a

public service. Bankruptcy fees that are lower than fees in other areas of the legal profession may operate properly when the attorneys appearing in bankruptcy cases do so intermittently, because a low fee in a small segment of a practice can be absorbed by other work. Bankruptcy specialists, however, if required to accept fees in all of their cases that are consistently lower than fees they could receive elsewhere, will not remain in the bankruptcy field.

H.Rep. No. 95–595 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

Congress thus made the clear choice to compensate attorneys in a way that would best effectuate the goals of the bankruptcy system. The same logic should also apply to appointed trustees. Therefore, since I conclude that the $362,500 fee award is reasonable and within the standards of section 326(a), I will reverse the decision of the bankruptcy court and enter judgment in favor of the trustee in the amount of $362,-500.00.