**In re LEEDY MORTGAGE COMPANY, INC., Debtor.**

**Bankruptcy No. 83–03502S.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 29, 1991.

Myron Bloom, Adelman Lavine Gold & Levin, Philadelphia, Pa., for debtor.

David S. Fishbone, Ciardi, Fishbone & DiDonato, Philadelphia, Pa., for trustee.

John P. Judge, Philadelphia, Pa., trustee.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy
Judge.

### A. INTRODUCTION

On the Trustee's appeal from this court's
award to him of final compensation of
$2,305 in addition to prior interim compen-
sation of $63,521.18 received by the Trust-
ee, the district court remanded this matter
to us (1) to review our power to reduce
compensation requested by the Trustee *sua
sponte;* (2) to conduct an evidentiary hear-
ing and make findings of fact regarding
the appropriate hourly rate of compensa-
tion for the Trustee, in light of the nature
of his duties; and (3) to determine whether
the Trustee was "lax and dilatory" in per-
forming his duties and, if so, how this
element should affect his compensation.
We conclude that (1) we do have the power,
and in fact have a duty, to review the
Trustee's request for compensation; (2) the
Trustee was, to at least some degree, "lax
and dilatory" in administering this case; (3)
given this fact and the Trustee's particular
skills and duties, compensation of $50 per
hour in reference to duties performed by
him between June 2, 1986, and the present
was quite generous; and (4) our prior
award should be reinstated.

### B. PROCEDURAL AND FACTUAL HIS-
TORY

The underlying bankruptcy of LEEDY
MORTGAGE COMPANY, INC. ("the Debt-
or") was initiated by the filing of a volun-
tary Chapter 11 case on September 8, 1983.
The case was assigned to our predecessor,
the Honorable William A. King, Jr. On
September 16, 1983, JOHN P. JUDGE
("the Trustee") was appointed as Trustee,
and, on September 20, 1983, the law firm of
Ciardi and Fishbone, now known as Ciardi,
Fishbone, and DiDonato ("the Ciardi
firm"), was appointed as his counsel. On
September 30, 1983, George L. Miller, P.C.,
whose business is now known as Miller and
Tate ("Miller"), was appointed as account-
ant for the Trustee.

The case thereafter remained in Chapter
11 for almost five years, despite the ab-
sence of an effort by any interested party
to propose a plan, until its conversion to
Chapter 7 as the result of a court-initiated
dismissal hearing on August 10, 1988.

A good perspective of the case as a
whole can be obtained by reading our two
published Opinions which it elicited, report-
ed at 111 B.R. 488 (Bankr.E.D.Pa.1990)
("*Leedy II*"); and 76 B.R. 440 (Bankr.E.D.
Pa.1987) ("*Leedy I*"), respectively. In
*Leedy I*, we denied in part and granted in
part a motion for summary judgment by
insurers sued by the Trustee on fidelity
bonds covering certain high-level employ-
ees of the Debtor in light of the frauds of
these employees. In so doing, we chron-
icled the apparent serious misdeeds of sev-
eral of these employees. *Leedy I*, 76 B.R.
at 451–59. In *Leedy II*, rejecting adminis-
trative claim of mortgage companies which
had employed the Debtor to service their
accounts for reimbursement of sums paid
to Miller to reassemble the Debtor's
records, we discussed the early stages of
the case in depth. 111 B.R. at 490, 492.
Per Miller's testimony on behalf of the
Trustee, we observed as follows:

At the time of the filing of its bank-
ruptcy petition, the Debtor was a party
to servicing contracts with various mort-
gagees, including the Claimants. The
Debtor had, on occasion, misapplied cer-
tain funds of Claimants and other mort-
gage holders. As the result of a pre-pe-
tition Alabama state court action, all
mail, including payments sent by mortga-
gors to the Debtor, was, for an indeter-
minate time, directed to the court house,
resulting in a complete inability of the
Debtor to service or post payments sub-
mitted to it.

At the time of the appointment of the
Trustee, the Debtor had no funds on
hand except payments received on ac-
count of the mortgages being served by
it which had been sent to the court
house. Under loan agreements with the
mortgagees, those funds were to be held
in trust by the Debtor and remitted to
the mortgagees. The Trustee filed an
Application with the court seeking au-
thority to use the trust funds for pay-
ment of the Trustee's administrative ex-

penses. Several mortgagees objected to that Application. The ultimate resolution was a Stipulation, Order and Joinder ("the Stipulation") approved by the Bankruptcy Court on or about October 31, 1983, joined by the Claimants, which provided that the Trustee would hire the Accountant, who would reassemble the Debtor's records, with each claimant to pay its pro rata share of these costs as allowed by the bankruptcy court....

.   .   .   .   .

... By the time that its bankruptcy petition had been filed, the Debtor had been revealed as no longer trustworthy as a servicing agent by any responsible mortgagee, and all of the mortgagees, including the Claimants, withdrew their contracts from the Debtor, some immediately and others in the following months. The servicing contracts yielded the Debtor only about $20,000 monthly in fees when it was servicing a full compliment of mortgagees, and hence it was not worth the Debtor's while to preserve these contracts at a cost to it of almost $108,000. As the Accountant [Miller] frankly stated, the most economical course for the Debtor to follow would have been to dump the entire bin of payments remitted to the state court in the laps of the Mortgagees and compel them to collectively figure out a way to do the necessary accounting. The Accountant opined that the beneficiaries of the Stipulation pursuant to which he performed the accounting were the mortgagees and that they, rather than the Debtor, championed his undertaking.

*Id.*

On November 16, 1983, Judge King entered an Order directing that the parties who entered into the Stipulation of October 31, 1983, advance, *inter alia*, $20,000 to the Trustee, as a pre-payment of anticipated commissions. Thereafter, from 1984 through 1986, a series of Orders were entered granting additional interim compensation to the Trustee, based upon calculations of the maximum commissions payable pursuant to the terms of former 11 U.S.C. § 326(a).

This statute presently reads as follows:

### § 326. Limitation on compensation of trustee

(a) In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims....

This version of § 326(a) reflects a revision, on July 10, 1984, as part of the Bankruptcy Amendments and Federal Judgeship Act ("BAFJA"), to provide, *inter alia*, that a trustee's maximum commission is measured at three (3%) percent of all sums disbursed which exceed $3,000. Prior to that date, the maximum commission was three (3%) percent of any amounts disbursed between $3,001 and $20,000; two (2%) percent on any amounts disbursed between $20,001 and $50,000; and one (1%) percent on any amounts disbursed in excess of $50,000. *See In re Greenley Energy Holdings of Pa., Inc.*, 94 B.R. 854, 856–57 & n. 2 (Bankr.E.D.Pa.), *rev'd on other grounds*, 102 B.R. 400 (E.D.Pa.1989); and 2 COLLIER ON BANKRUPTCY, ¶ 326.01, at 326–14 to 326–17 & n. 21 (15th ed. 1990).

Because of errors in the Trustee's Applications and the court's Orders (*e.g.*, on September 24, 1984, the court entered an Order granting an interim award of $49,-817.94, the full amount requested; although this Order was never vacated, it was apparently later discovered that this Order was in error and the sum recited was not paid to the Trustee), it was very difficult to ascertain the total amount of the interim compensation actually received by the Trustee. Only by submission of cancelled checks have we determined, to our

satisfaction, that the sum paid was $63,-521.18, which is slightly different than the $63,516.27 which the Trustee claimed that he had been paid prior to these submissions, and from the $63,516.18 figure which the Trustee recites in his letter covering submission of the checks.

The Ciardi firm and Miller were also handsomely compensated for their services. By our calculation, Miller has received almost $570,000 and the Ciardi firm has received over $360,000 from the estate's funds for their services.

The docket entries of the case reveal little substantive activity in the main case between spring, 1984, and September 29, 1989. The latter date was about a year after the court became aware that most of the litigation spawned by the case, particularly the litigation described in *Leedy I* and a suit against the accountant of the Debtor, *cf. In re Philadelphia Mortgage Trust*, 930 F.2d 306 (3d Cir.1991) (suit of related entity against accountants), had been completed, and the case had been converted to Chapter 7.

On September 29, 1989, the United States Trustee ("the UST") filed a motion to remove the Trustee for cause, due to the long delays in administration of this case ("the UST Motion"). After a hearing on the UST Motion on October 31, 1989, this court entered an Order requiring the Trustee to file Objections to proofs of claims, which he had not begun to do in the period of over six years since his appointment; scheduled hearings on those Objections and an adversary proceeding mistakenly left dormant for several years on January 4, 1990; and continued the UST Motion until that date.

The UST Motion was continued again until February 28, 1990, after which we entered an Order of March 1, 1990, requiring the Trustee or his counsel to file the final audit papers in the case by May 1, 1990; a final audit hearing date of June 5, 1990; and required the closing of the case by October 1, 1990. The UST Motion was continued to June 5, 1990, as well.

The audit papers were filed in accordance with this Order, but the final audit hearing and the hearing on the UST Motion were again continued until July 12, 1990, and then again to July 31, 1990. On the latter date, we entered an Order of July 31, 1990, approving the Trustee's account; requiring submission of papers necessary to close the case by January 1, 1991; rescheduling the UST Motion on January 3, 1991; [1] and stating as follows, regarding the Trustee's commissions:

2. The Trustee is awarded compensation in the amount of $2,305.00 [as opposed to requested final compensation of $14,100.83, requested in addition to the interim compensation of $63,521.18 already paid to him]. Having reviewed his time records [itemizing 53.8 hours of services between June 2, 1986, and March 10, 1990], we have reduced the compensable time [pursuant to specific notations of all disallowances on the Application] to 46.1 hours. We believe that $50 per hour is an adequate rate of compensation, given the fact that the UST was obliged to file a motion seeking to remove the Trustee due to delay in administration of this case, and our observation is that much of the Trustee's duties were ministerial. *See In re Samson Industries, Inc.*, 108 B.R. 545, 550–51 (Bankr. E.D.Pa.19[90]).

The Trustee appealed our Order to the district court, demanding that it direct this court to award him the difference of $11,-795.83 between his request and our award. On January 28, 1991, the district court, in a Memorandum Opinion in C.A. No. 90–5527, 1991 WL 9960, remanded the matter to us

---

**1.** In his Brief to the district court appealing our July 31, 1990, Order, at 19, the Trustee states that this court "previously denied the [UST's] Motion," implying that it was therefore unfair for the court to consider the presence of the UST Motion as a factor in determining the amount of his commissions. In fact, the UST Motion was not disposed of prior to the July 31, 1990, Order, as the Order itself indicates. When the Trustee finally completed administration of this case in 1991, we did not act on the UST Motion. However, the importance of the presence of that Motion as a prod to finally get this case completely administered should not be minimized.

to consider the questions outlined at page 909 *supra.*

While the appeal was pending, the Trustee filed an Application seeking to delay the filing of the proposed Order of Distribution until March 15, 1991, and the filing of papers necessary to close this case 45 days after his appeal from the July 31, 1990, Order was resolved. This Motion was denied in an Order of December 31, 1990, as we could tolerate no further delays in the administration of this case. The Trustee was instead granted an extension until March 15, 1991, to close the case. These papers were timely filed and this case remains open only because of the instant dispute.

Upon receipt of the record from the district court upon remand, we entered an Order of March 12, 1991, requesting the Trustee to file and serve upon the court in chambers the following, by 4:30 P.M. on April 12, 1991, prior to a scheduled hearing to be attended by the Trustee and the UST on April 18, 1991, in order that we could attempt to take the advice of the district court to resolve this matter in a bench opinion:

a. A statement of all compensation received in this case and the basis for same. The court questions [with justification, as it turned out] the accuracy of the $63,516.27 figure represented as the amount received in the past and the basis for the calculations. Specifically, we question whether the Trustee's payments to investors are "disbursements," within the scope of 11 U.S.C. § 326(a).

b. A statement of time expended by the Trustee prior to June 2, 1986. As the Trustee apparently kept no contemporaneous records, any comprehensible reconstruction or approximation is permissible.

c. The Trustee's position as to the correct formula for calculating his commissions. It appears that the Trustee has suggested that the post–1984 version of § 326(a) was applicable, even though this case was filed in 1983.

Only after an inquiry to the Trustee's counsel did we belatedly receive his Statement in response to our Order on April 15, 1991. In that Statement, for the first time since the entry of the Order of March 12, 1991, the Trustee objected to that Order, alleging that this court "is not permitted to consider ... other than what was specifically directed by the District Court." The Trustee therefore "declined" to provide any details relating to his services performed prior to June 2, 1986, contending that, in any event, he could only speculate as to same at this time. He did include some argument supporting the propriety of considering the disbursements to the mortgagees in computing his maximum commissions. He also argued that, while he believed that the post–1984 version of § 326(a) applied, he would agree to accept $10,882.52, the maximum which he computed pursuant to the pre–1984 version of § 326(a).

The hearing of April 18, 1991, was attended by Assistant UST Kevin Callahan, Esquire ("the AUST"); the Trustee; and counsel from the Ciardi firm. The AUST, who was engaged during most of the hearing in another court room and therefore was unable to participate except at the outset, expressed, before departing, the UST's position on several of the issues before us. Firstly, he stated that this court can and should review applications for compensation even when the UST himself has not filed Objections thereto. He noted that a shortage of resources in the UST's office and that office's confidence that this court would carefully review all such applications irrespective of the UST's filing same prompted the UST to file objections in only a small percentage of cases where objections were warranted.

The AUST also defended the merit of its Motion to remove the Trustee, although he pointed out that this was only one of several such motions filed about that time, and that the goal of such filings was getting cases closed rather than actually unleashing the consequences of 11 U.S.C. § 324 (removal of the Trustee from all cases) against the Trustee. Finally, the AUST briefly opined that the disbursements to the mortgagees in this case should be considered in applying the formula of 11

U.S.C. § 326(a) and that the pre–1984 formula should probably be applied even though the case was converted to Chapter 7 after the BAFJA Amendments, as the case itself was filed prior to their enactment.

The Trustee then testified at length. He stated that he and the Ciardi firm were appointed by Judge King during an ex parte in-chambers meeting. He contended that the Debtor remained in business for about a year after he was appointed and that he was obliged to operate the business during this period. When questioned about Miller's testimony in *Leedy II* on his behalf stating that the Debtor's business disintegrated quickly after the filing, the Trustee disputed same, suggesting that Miller, in his testimony, had exaggerated his own role, and that the Trustee himself had in fact shouldered considerable responsibilities, particularly in the operation of the Debtor's Bala–Cynwyd office.

The Trustee then reviewed his resume. The Trustee is 71 years old, and states that, recently, his health has been poor. He has no degrees past high school, although he claimed to have taken some college-credit accounting courses. No professional licenses nor affiliations were identified. From 1943 through 1963, the Trustee held positions, undoubtedly obtained through political appointments, in the Philadelphia City government. From 1983 to 1971, he was appointed (politically) as the Commonwealth's Commissioner of Occupational Affairs. From 1971 through 1983, he held various offices and directorships with several lending institutions. The culmination of these positions was the Trustee's appointment as President of a small savings and loan association from 1982 until his retirement in 1983, apparently shortly before his appointment as Trustee. The highest salary that the Trustee attained during his career was $62,000, during his brief tenure in the last-named position. Thereafter, the Trustee served as an active member of the panel of Chapter 7 trustees of this court in 1985–86 and again for a period in 1988–89.

The Trustee declined our repeated invitations to quote an hourly rate for his services. He noted that, in several appointments as an "umpire" by state court judges, he had received $125 per hour. Named as his first "reference" on his resume is William A. Meehan, Esquire, well-known as the head of the Republican Party in Philadelphia.

## C. FACTUAL FINDINGS

From the foregoing, we draw the following factual conclusions. The Trustee did spend considerable time in the performance of his duties as trustee in the early stages of this case. However, we believe that the period for which he worked full-time at the outset of the case in fact did not exceed four months. We credit the disinterested testimony of Miller, on the Trustee's own behalf, at the hearing of February 28, 1990, noting that the Debtor's business declined rapidly between October, 1983, and January, 1984. Therefore, we find that, after the first four months, the Trustee devoted increasingly less time to this enterprise.

While the Trustee appeared to us to be sincere and honest in performing his duties, we find his qualifications unspectacular. Most of his attainments were political appointments. We believe that his appointment as Trustee was driven more by political considerations than any other qualifications. *Compare In re Beck–Rumbaugh Associates, Inc.,* 68 B.R. 882, 887–89 (Bankr.E.D.Pa.1987), *aff'd,* 84 B.R. 369 (E.D.Pa.1988).

We further find that administration of this case was extremely dilatory. During that portion of the April 18, 1991, hearing when the AUST was present, the Trustee's counsel hypothesized that the suspension of administration of this case until 1990 resulted from the inability of counsel to complete the litigation against the accountants until November, *1989.* Later, counsel acknowledged that, in fact, this litigation had been completed in November, *1988,* leaving a one-year gap in this articulated justification for this delay.

No case should, as this case did, linger in Chapter 11 for almost five years, without

any prospect of a plan. The process of objecting to claims could have occurred years before this court and the UST compelled it to occur, which would have dramatically speeded its disposition. Even after this court and the UST focused their own respective attentions on the case, it took well over a year for the Trustee to complete the process of administration. We do note that on March 12, 1991, the case was finally made ready for closing, pending only disposition of this matter. The Trustee also revealed that about $8,000 of estate funds had been placed in reserve pending disposition of this matter. Our disposition, which is totally consistent with our earlier Order, and should therefore have hardly been surprising, will require a delay of an additional several months in the final closing of this case, while this reserve is distributed.

We continue to believe that the rate of $50 per hour, previously established in our Order of July 31, 1990, is an appropriate rate of compensation for the Trustee in this case. If we were inclined to make any adjustment in the figure arrived at on July 31, 1990, it would be to reduce the amount which we awarded in that Order, because we believe that $63,521.18 was itself a sufficient award to the Trustee for all his services, in light of the total commitment of time comparable to one year of full-time employment; the relative simplicity of his tasks, as opposed to those performed by his counsel and accountant (for which they were well-compensated); and his dilatory performance of his duties.

D. DISCUSSION

1. THIS COURT HAS THE POWER AND DUTY TO REVIEW ALL COMPENSATION RECEIVED BY THE TRUSTEE IN MAKING A FINAL AWARD OF COMPENSATION, EVEN THOUGH THE DISTRICT COURT DID NOT DISCUSS THIS ISSUE.

Our above disposition requires some discussion of pertinent legal issues. We begin with the Trustee's challenge to our power, *i.e.*, apparently, our jurisdiction, to review the entire history of his compensation throughout this case in rendering this decision, as opposed to focusing only upon the period after June 2, 1986, covered by the final Application presented to us.

The duties of a trial court on remand from an appellate court are usually expressed as controlled by the "law of the case doctrine." *See Cowgill v. Raymark Industries, Inc.*, 832 F.2d 798, 802–04 (3d Cir.1987); and *Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir.1984). That doctrine applies, however, to only those " 'issues that were actually discussed by the court in the prior appeal [and] to issues decided by necessary implication.' *Todd & Co., Inc. v. SEC*, 637 F.2d 154, 157 (3d Cir.1980)." *Id.*

■ In any event, the "[l]aw of the case directs a court's discretion, it does not limit its power." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). The doctrine is not applied to compel a court to follow a prior holding when the prior holding "is clearly erroneous and would work a manifest injustice." *Id.* at n. 8. *See also Sweitlowich v. County of Bucks*, 610 F.2d 1157, 1164 (3d Cir.1979); and *In re Cole*, 89 B.R. 433, 436 (Bankr.E.D.Pa.1988).

■ The district court was not presented with, and therefore did not discuss, the issue of the Trustee's interim compensation requests. However, it must be recalled that interim compensation awards are purely interlocutory and, as such, are *always* made subject to review and adjustment when an application for a final award of compensation is made. *See In re Valley Forge Plaza Associates*, 119 B.R. 471, 472 (E.D.Pa.1990); and *In re St. Joseph's Hospital*, 102 B.R. 416, 421 (Bankr.E.D.Pa. 1989).

■ To the extent that this court, driven by an anxiety to bring this case to end, failed to consider the propriety of the prior interim awards in entering our Order of July 31, 1990, we erred. Our attention became focused on our need to do so only after the district court's remand. We have no doubt that it was not only appropriate, but also necessary, to revisit the propriety

of all of the interim awards to the Trustee in fixing his final compensation.

### 2. THIS COURT HAS THE POWER AND DUTY TO REVIEW ALL APPLICATIONS FOR COMPENSATION PAID OUT OF THE FUNDS OF DEBTOR ESTATES, IRRESPECTIVE OF WHETHER THE UST OR ANY OTHER PARTY RAISES ANY OBJECTION THERETO.

■ Most of the district court's Memorandum Opinion is devoted to consideration of the issue of whether the advent of the UST detracted from the principle that a bankruptcy court alone has the ultimate responsibility for determining compensation due to professionals and therefore must review same before affixing its signature to an order for compensation. The statements of the UST at the instant hearing well express the policy reasons why the UST's active participation in the process of review of applications for compensation to be paid from debtors' estates, while helpful to the court when accomplished, cannot be conclusive of the court's own power and duty in considering such matters. Per the Statements of the AUST, it is apparent that the UST's office is too overburdened with other duties to devote significant resources to this task. Moreover, the UST is well aware that this court "must ... be prepared to accept responsibility for its judicial actions by independently determining that court authorization of the fee payment is warranted." *In re Metro Transportation Co.*, 107 B.R. 50, 53 (E.D.Pa.1989). Therefore, as a matter of structuring his priorities, the AUST explained that the UST has left this area largely to the court. We must pick up this slack if compromise of the integrity of the system is to be avoided. *Cf. Philadelphia Mortgage Trust, supra,* 930 F.2d at 309 ("Congress chose to require court approval ... in order to eliminate abuses and detrimental practices such as cronyism of the 'bankruptcy ring' ...").

The Trustee, in his appeal, relied heavily upon a short Order of the district court in *In re Pendleton,* 1990 WL 29645 (E.D.Pa. March 15, 1990), which in turn cited to *Bell v. United Princeton Properties, Inc.,* 884 F.2d 713, 719 (3d Cir.1989); and an Order in *Fleet v. United States Consumer Council,* C.A. No. 89–7527, 1990 WL 18926 (E.D.Pa. Feb. 23, 1990), in support of the principle that, if there is no objection from any interested party in the case to a fee application, the court should ordinarily enter an order granting the full amount of the application requested. However, in both *Bell* and *Fleet* (although the latter is a bankruptcy case), the respective awards of attorneys' fees in issue were entered in the context of fee applications brought pursuant to statutes which shifted fees to the opposing party. In such instances, fees are not payable from debtors' estates.

To the extent that *Pendleton,* which involved a difference of $500 in an award of counsel fees in a Chapter 13 consumer case and hence arose in a context quite distinct from the instant case, suggests abandonment of the principle that a bankruptcy court cannot delegate its responsibility to render awards of compensation out of the funds of a debtor's estate to other entities, including the UST, it is against the weight of all other authority and cannot be followed. As we stated in *In re Patronek,* 121 B.R. 728, 730 n. 4 (Bankr.E.D.Pa.1990),

> [p]rior to the *Pendleton* order, it had been universally held, in this jurisdiction, that fee applications in bankruptcy cases, being the archetype of "fund-in-court" cases, are subject to court review even if there is no objection by any other party. *See, e.g., In re Reader,* No. 87–3701, Memorandum Opinion, slip op, at 2–3 [845 F.2d 1014 (Table)] (3d Cir. March 10, 1988); *In re Metro Transportation Co.,* 107 B.R. 50, 53–54 (Bankr.E.D.Pa. 1989); *In re National Paragon Corp.,* 87 B.R. 11, 13 (Bankr.E.D.Pa.1988); and *In re J.A. & L.C. Brown, Inc.,* 75 B.R. 539, 539–40 (Bankr.E.D.Pa.1987). *See generally* Third Circuit Task Force, *Court Awarded Attorney Fees,* 108 F.R.D. 237, 255 (1985) ("the court must ... monitor the disbursements of the fund and act as fiduciary for those who are supposed to benefit from it").

Decisions in other jurisdictions uniformly concur. *See, e.g., In re Pothoven,* 84 B.R. 579, 583 (Bankr.S.D.Iowa 1988) (en banc), and cases cited therein; and 2 COLLIER ON BANKRUPTCY, ¶ 330.05[a], at 330–36 to 330–37 (15th ed. 1990). *Cf. Philadelphia Mortgage Trust, supra,* 930 F.2d at 309 (prior court approval of appointment of professionals is always required).

We therefore conclude that we had the duty to review all of the orders awarding compensation to the Trustee in this case, irrespective of the inability of the UST to actively participate in this process. We now turn to the process which this court must utilize in measuring whether the amount of compensation fixed in our Order of July 31, 1990, was appropriate.

### 3. THE TRUSTEE PROPERLY CONSIDERED DISBURSEMENT MADE TO MORTGAGEES IN COMPUTING HIS MAXIMUM COMMISSION.

■ Firstly, we believe that it was appropriate for the Trustee to consider his disbursements to the mortgagees in computing his maximum compensation under 11 U.S.C. § 326(a). The last phrase of that statutory provision itself, see page 5 *supra,* expressly includes disbursements to secured creditors among those be factored into such computations. The crucial issue in determining whether certain payments should be considered in the calculations is whether the Trustee was himself actually engaged in the process of making disbursements to secured creditors, as opposed to a situation where sums paid to such creditors do not actually pass through the Trustee's hands. *See* 2 COLLIER, *supra,* ¶ 326.01, at 326–24 to 326–27. Unlike payments made directly to secured creditors by a debtor, *see, e.g., Mishler v. Aberegg,* 121 B.R. 553 (N.D.Ind.1990); and *In re Lambert Implement Co.,* 44 B.R. 860, 862 (Bankr.W.D.Ky.1984), which should not generally be viewed as "disbursements" in computing a trustee's compensation. The instant Trustee, at least through his agent Miller, *see Leedy II,* 111 B.R. at 490–92, actually collected the funds payable to the mortgagees, posted them, and then paid them to the mortgagees. In these circumstances, we believe that it was appropriate to consider these funds to have been "disbursed" to the secured creditors in computing the Trustee's maximum compensation.

### 4. THE PRE–1984 VERSION OF 11 U.S.C. § 326(a) MUST BE UTILIZED TO COMPUTE THE MAXIMUM COMPENSATION PAYABLE TO THE TRUSTEE.

■ Secondly, we believe that the pre-BAFJA version of § 326(a) must be utilized to measure the Trustee's maximum compensation under § 326(a) in this case. The former version of § 326(a), *see* page 910 *supra,* indisputably applies to all cases filed prior to July 10, 1984. *Cf. In re American Int'l Airways, Inc.,* 68 B.R. 326, 327 (Bankr.E.D.Pa.1986), *aff'd,* C.A. No. 87–1287, 1987 WL 54484 (E.D.Pa. May 12, 1987). We recognize that this case was converted from Chapter 11 to Chapter 7 after the effective date of BAFJA. However, conversion of a case from one chapter to another "does not effect a change in the date of the filing of the petition, [or] the commencement of the case, ..." 11 U.S.C. § 348(a).

It is not inequitable to apply the prior version of § 326(a) in calculating the instant Trustee's request for compensation. The Trustee accepted his appointment in September, 1983, and performed the bulk of the services for which he seeks compensation prior to July 10, 1984. The conversion of the case did not result in a change of the Trustee's status qua trustee. He was appointed as Chapter 7 Trustee to succeed himself as Chapter 11 Trustee.

In preparing his own interim fee applications, all filed while the case was in Chapter 11, the Trustee utilized the pre–1984 version of § 326(a) as the basis for calculation. There appears to be no just reason to shift to another method of calculation in computing the Trustee's final compensation. In his Statement submitted in accordance with our Order of March 12, 1991, the Trustee indicates his willingness to accept the sum which is derived from use of the

pre–1984 formula, *i.e.,* $10,882.52 instead of $14,100.83, the sum originally demanded. As the Trustee advised during the hearing, only about an $8,000 reserve remains in the estate accounts at this point, after distribution, in any event. Therefore, the disposition of this issue would not have any practical effect on the result in any event.

### 5. THE TRUSTEE HAS FAILED TO MEET HIS BURDEN OF ESTABLISHING THAT THE COMPENSATION AWARDED TO HIM WAS INADEQUATE.

In our efforts to determine the time expended by the Trustee for his services or the appropriate hourly rate for his services, we were not significantly assisted in any way by the Trustee's submissions or testimony. His descriptions of the time spent in fulfilling his duties were scanty and vague. The Trustee's position appeared to be influenced by the erroneous assumption that he had an entitlement to the maximum commission allowable under § 326(a). *See Greenley Energy, supra,* 94 B.R. at 857–58.[2]

■ Like any other court appointee requesting compensation out of assets of the estate, the Trustee was obligated to bear the burden of proving all aspects of the worth of his services and the magnitude of his compensation award. *See, e.g., Woods v. City Nat'l Bank & Trust Co.,* 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941); *Metro Transportation, supra,* 107 B.R. at 53; *In re Ralph Marcantoni & Sons, Inc.,* 62 B.R. 245, 247 (D.Md.1986); *In re Grabill Corp.,* 110 B.R. 356, 358 (Bankr.N.D.Ill.1990); and *In re Saybrook Mfg. Co.,* 108 B.R. 366, 370 (Bankr.M.D.Ga. 1989). *Cf. Northeast Women's Center v. McMonagle,* 889 F.2d 466, 477 (3d Cir. 1989), *cert. denied, sub nom. Walton v. Northeast Women's Center,* — U.S. —, 110 S.Ct. 1788, 108 L.Ed.2d 790 (1990).

■ Although the district court directed us to conduct a hearing in this instance to determine the sum properly payable to the Trustee after remand in this instance, we note that

> Bankruptcy Rule 2016 requires that all the necessary information be in the fee application itself. Applicants cannot rely on the fee petition hearing to "explain" the fee petition. Life is too short and the daily court call is too crowded to allow valuable court time to such verbal explanations and testimony thereon. Applicants must put the explanations in writing and may submit accompanying affidavits containing further explanations or details if necessary.

*In re Pettibone Corp.,* 74 B.R. 293, 300 (Bankr.N.D.Ill.1987). *Accord, e.g., Blum v. Witco Chemical Corp.,* 829 F.2d 367, 377 (3d Cir.1987); and *Pothoven, supra,* 84 B.R. at 582–83. This observation is particularly appropriately applied to this court, where the judges, statistically determined to be among the nation's busiest, are confronted with several thousand fee applications each year, *see Patronek, supra,* 121 B.R. at 730, and sizable applications in large Chapter 11 or Chapter 7 cases arrive at the rate of about one a day.[3]

Even after the extensive hearing of April 18, 1991, where we gave the Trustee every opportunity to quantify the time of his services and the rate for such time, the Trustee was unable to meet his burden on either score. The Trustee was either unable or unwilling to tell us just how much time he spent on the case or what he thought his hourly rate should have been for performance of such services. Having failed to meet his burden of proving the elements necessary for us to consider to fix his compensation, the Trustee subjected himself to potential denial of all or most of his compensation.

It is no excuse for the Trustee to say, as his counsel did, that the Trustee was un-

---

**2.** The district court's reversal did not disturb this holding, nor the principle that a trustee's right to compensation must be established in accordance with 11 U.S.C. § 330(a). 102 B.R. at 402–03.

**3.** The citation, in the Trustee's district court Brief, of six instances where the district court has reversed or remanded fee awards of this court in 4½ years must be placed in this context.

aware of his duty to keep any sort of time records because his services preceded our decision spelling out this obligation in *Samson Industries, supra,* 108 B.R. at 549–51. The *Samson Industries* decision, *id.,* at 549, merely followed decisions by the Third Circuit Court of Appeals published over 20 years ago. *In re Imperial "400" National, Inc.,* 432 F.2d 232, 237 (3d Cir.1970); and *United States v. Larchwood Gardens, Inc.,* 404 F.2d 1108, 1113–16 (3d Cir.1968).

Therefore, in light of the scant efforts of the Trustee to meet his burdens, we believe that, if anything, we granted unwarranted dispensations to the Trustee in rendering our award. Only our belief that it would be unfair to take away compensation previously granted to an aged and ailing individual causes us to stay our hand from substantially reducing the compensation previously awarded to the Trustee.

### 6. OUR PREVIOUS AWARD OF FINAL COMPENSATION TOTALLING $65,826.18 WILL BE REINSTATED.

Giving the Trustee every benefit of the doubt, we conclude that he did work about four months as a full-time manager of the Debtor's business and, adding these services to all of the services performed by him in the several years thereafter, possibly worked the equivalent of a full year in such a management role. Our award of $2,305.00 additional final compensation, in our Order of July 31, 1990, was, effectively, an award of that sum plus the interim Orders of $63,521.18, or compensation of $65,826.18. This award was approximately equivalent to, although it exceeds, the Trustee's highest full-time salary in private industry of $62,500. The Trustee, while perhaps not required to accept less than the value of his services outside of bankruptcy court, should not expect to receive more from the debtor's estate than he did for performing services of comparable value in private employment.

The duties demanded and performed by the Trustee here are a far cry from those performed by the Trustee in *In re Greenley Energy Holdings of Pa., Inc.,* 102 B.R. 400, 401–02 (E.D.Pa.1989). The *Greenley Energy* trustee was found to have taken a business that had ceased functioning and to have turned it into a viable company with a promising future, thus performing a "small miracle." *Id.* The instant Trustee was commissioned to wind down a business the credibility of which, prior to his appointment, was unfortunately so severely damaged that rehabilitation was never a serious consideration and hence could not be attempted. While the winding down process did not unravel in his hands, the Trustee clearly performed no miracles, large or small, in the process. He performed average-level bankruptcy work with average competence at a somewhat less than satisfactory pace. We again emphasize the delays in the process of administration as very significant. A trustee's "main duty" is "to expeditiously close the estate." *In re Riverside–Linden Investment Co.,* 925 F.2d 320, 322 (9th Cir.1991).

We collected numerous cases which have established appropriate hourly rates for trustees, ranging from $20 per hour to over $100 per hour, in *Samson Industries, supra,* 108 B.R. at 549–50. More cases, to the same or similar effect, could doubtless be added to this list. *E.g., In re Rauch,* 110 B.R. 467, 477 (Bankr.E.D.Cal.1990) ($65 per hour awarded to expert, highly qualified trustee).

In *Samson Industries,* we awarded $25 per hour to a trustee whose delay in administration of the case left us "less than totally pleased." 108 B.R. at 551–53. In *In re Rheam of Indiana, Inc.,* 111 B.R. 87, 93 (Bankr.E.D.Pa.1990), we awarded a trustee of skills comparable to those of the instant Trustee and who promptly administered an admittedly far less complex case his requested rate of $50 per hour. *Cf. In re J.E. Jennings, Inc.,* 100 B.R. 749, 753 (Bankr.E.D.Pa.1989) (non-attorney Secretary of Creditors' Committee awarded compensation at $50 per hour). In *In re Doctors, Inc.,* 4 B.R. 346, 348 (Bankr.E.D.Pa. 1980), the trustee's hourly rate of "less than $50.00 per hour" was deemed "fair and reasonable." In *In re Paolino,* 80 B.R. 341, 347 (Bankr.E.D.Pa.1987), Horace

Stern, Esquire, an eminent and very experienced member of the local bankruptcy bar, who commands at least twice that rate in his private practice, requested compensation and therefore was awarded same at a rate of $110 per hour by Judge Fox of this court for services as trustee in a problematical Chapter 11 case featuring an extremely litigious debtor.

Considering these precedents, compensation of $50 per hour, which translates into an annual salary of about $100,000, appears a very generous rate by which to measure the compensation of the Trustee. While inflation would probably justify a 100% adjustment upward of the $20 per hour rate fixed by the Third Circuit in *Larchwood Gardens*, today, *see Rheam of Indiana*, 111 B.R. at 98, it must also be recalled that the bulk of the services in issue were performed several years ago, in 1983 and 1984.

■ We therefore conclude, after a careful review of all of the issues which the district court directed us to consider and several others which we deemed necessary to consider as well, that the effective award of final compensation to the Trustee of $65,826.18, in our Order of July 31, 1990, was, if anything, generous to the Trustee and therefore it would not be appropriate to adjust it upward.

E.  CONCLUSION

We will therefore proceed to enter an Order reinstating the portion of our Order of July 31, 1990, allowing the Trustee $2,305.00 compensation in addition to his prior interim awards totalling $63,521.18, for a total of $65,826.18.